**Jose SALDANA, Petitioner–Appellee,**

v.

**The STATE OF NEW YORK, Respondent–Appellant.**

**No. 512, Docket 87–2298.**

United States Court of Appeals, Second Circuit.

Argued Dec. 11, 1987.

Decided June 27, 1988.

Steven Glickstein, New York City (Kaye, Scholer, Fierman, Hays & Handler, New York City, Louis H. Benjamin, Patrick M. McGovern, of counsel), for petitioner-appellee.

Ann M. Donnelly, Asst. Dist. Atty., New York County (Robert M. Morgenthau, Dist. Atty., New York County, Norman Barclay, Asst. Dist. Atty., New York County, New York City, of counsel), for respondent-appellant.

Before LUMBARD, OAKES, and PRATT, Circuit Judges. .

LUMBARD, Circuit Judge:

The State appeals from an order of the Southern District, Broderick, J., entered July 10, 1987, which granted Saldana's petition for a writ of habeas corpus and vacated his jury conviction in New York County entered in July 1981, for attempted murder in the first degree, and related charges. Saldana was sentenced, as a predicate felon, to concurrent prison terms of from 25 years to life, and lesser terms on the other counts, to run consecutively to a federal sentence for bank robbery which he is now serving.

The district court found that Saldana had been denied due process because the district attorney presented the case to the grand jury without allowing Saldana the opportunity to testify before the grand jury as provided by the New York Criminal Procedure Law upon request of a defendant. N.Y.Crim.Proc.Law § 190.50(5)(a).

We reverse and dismiss the petition.

After his arrest in February, 1980, but before indictment, Saldana wrote to Judge Mogel of the Criminal Court that he intended to appear before the grand jury. At the calendar call before Judge Mogel on March

11, 1980, Saldana's attorney repeated his wish to appear before the grand jury. Judge Mogel inscribed on the official court record that "D wishes to testify before GJ." The calendar call was continued until March 19, at which point Saldana appeared without counsel and orally repeated his request. In response, the assistant district attorney assigned to the part told the judge that he would note the request on the district attorney's papers.

The grand jury indicted Saldana on May 16, 1980, without hearing his testimony. When he was arraigned on September 15 before Justice Burton Roberts, Saldana timely moved, again *pro se*, to dismiss the indictment complaining that he had "requested before the Criminal Court presiding justice ... and in the presence of the prosecuting attorney for permission to testify on my own behalf. This request was never granted although my request was made in open Court." Assistant District Attorney Warren Murray told the court that Saldana had failed to serve written notice as required by § 190.50(5)(a). The State did not tell Justice Roberts about Saldana's letter to the criminal court or that he notified the State on the record at the March 11 calendar call of his desire to testify. Nor did the prosecutor apprise Justice Roberts that the State had agreed to make a written note of defendant's request at the March 19 calendar call. Justice Roberts denied the motion because of failure to file the written notice.

The indictment charged Saldana and Maliki Latine with attempted murder in the first degree, assault in the first degree and four counts each of criminal possession of a weapon and criminal possession of stolen property in the third degree. After four weeks of trial the jury convicted them as charged. On October 1, 1981, Saldana was sentenced.

In the Appellate Division, Saldana (appealing *pro se*), in addition to alleging insufficient evidence and errors of the district attorney and of his own counsel, complained that the indictment should have been dismissed because he was denied the opportunity to testify before the grand jury. The State responded that Saldana had not filed written notice of his desire to testify as required by § 190.50(5)(a). The State also argued that Saldana's motion to dismiss was untimely and that the issue was, therefore, not preserved for appeal. In his reply brief, Saldana refuted this point. As conceded by the State during oral argument before this court, the State's position on this issue in the Appellate Division was erroneous because Saldana's motion was in fact, timely made. The Appellate Division did not have before it a copy of Saldana's date-stamped motion to dismiss the indictment. After unanimous affirmance without opinion on January 12, 1984, 471 N.Y.S.2d 727, 99 A.D.2d 686 (1st Dept.1984), the New York Court of Appeals denied leave to appeal.

Saldana petitioned the district court for a writ of habeas corpus on June 18, 1984. The district court originally dismissed the petition on exhaustion grounds. On rehearing, Judge Broderick reviewed on the merits Saldana's four claims, one of which was that he was denied effective assistance of counsel because his attorney failed to serve the district attorney with written notice of Saldana's intent to appear before the grand jury. The district court again dismissed the petition on October 11, 1985. Among other things, Judge Broderick concluded that "while the failure to provide a target the opportunity to testify on his own behalf may create the appearance of inequity.... it does not amount to a federal constitutional violation" and accordingly, Saldana, "was not constitutionally prejudiced" by failure of his counsel. In addition, the court wrote that Saldana had not shown that he would have "provided any information to the grand jury that might have persuaded the grand jury not to indict him." The court rejected Saldana's other contentions.

After Saldana appealed to us on the district court's certificate of probable cause, we assigned counsel who applied to the district court for rehearing. We remanded when the district court agreed to consider the case further.

On remand, Saldana renewed his ineffective assistance claim and two additional claims: that by denying him the right to appear before the grand jury, the State had violated his rights to due process and equal protection. The district court about-faced on July 10, 1987, 665 F.Supp. 271, and granted Saldana's petition. Judge Broderick held that because Saldana had substantially complied with New York's statute, he was denied due process by the State's failure to allow him to appear to testify. He also concluded that the error was not harmless because the State had not met its burden of proving harmlessness beyond a reasonable doubt.

We reverse and dismiss the petition for two reasons: First, Saldana has failed to exhaust his State remedies; the New York Courts have not had the opportunity to consider whether the actions of the district attorney violated Saldana's constitutional rights to due process and equal protection. 28 U.S.C. § 2254(b).

Second, we find that there is no reason to believe that Saldana's appearance and testimony before the grand jury could have resulted in any different action by the grand jury. Consequently, we conclude that the State's error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ Saldana makes a strong showing that the action of the district attorney, whether careless or intended, denied him the right under New York law to appear before the grand jury which was considering his case. However, he has not exhausted his remedies before the State courts regarding the crucial question whether the State's disregard of his repeated and timely requests to appear before the grand jury denied his constitutional rights to due process and equal protection under the law. Indeed, that question was not before the New York courts on the facts which now seem settled and undisputed. It now appears, and the State concedes, that Saldana did make timely application for dismissal of the indictment, and that Justice Roberts, who denied Saldana's motion to dismiss,

was not advised of this by the district attorney. Nor were the facts brought to the attention of the Appellate Division which we must assume affirmed the denial to dismiss on the procedural ground that it was not timely made. *See Martinez v. Harris*, 675 F.2d 51, 54–55 (2d Cir.1986). Thus, the New York courts have not passed upon the question whether the denial of Saldana's rights was of such dimension and nature to constitute denial of due process, or whether New York law requires that the indictment be dismissed.

■ We conclude, however, that instead of dismissing the petition for failure to exhaust remedies, in the interests of judicial economy, we should reverse and dismiss the writ because, regardless of what the State courts might decide upon further consideration of the federal issue, Saldana has not suffered any harm to justify relief under federal law in federal court. Of course, this dismissal is not meant to prejudice any relief which may still be available to Saldana under state law in the New York courts.

Saldana is not entitled to relief in the federal courts because the State's failure to allow him to testify before the grand jury could not have made any constitutional difference because he suffered no prejudice. A review of the State's case presented at the trial (as recited in the People's brief, and largely uncontradicted by petitioner), shows how unlikely it is that any testimony by Saldana himself—if indeed he would ever have testified—could have made any difference in the charges filed by the grand jury.

The evidence established that between 2:00 and 3:00 a.m. on July 3, 1973, Locksley Green, a gypsy taxicab driver had an accident with a blue Malibu in upper Manhattan. The Malibu, which was stolen, was driven by Jamal Thomas. With Thomas were three passengers—Saldana, Latine and Aikel Shakur.

After the accident, Thomas stopped the Malibu and spoke briefly with Green and the manager of the taxi service, Horace Neufville, who had arrived shortly after the accident occurred. After determining

that Thomas possessed neither a license nor a car registration, Neufville walked back to his car to call his company. At that point, Thomas jumped in his car and drove away, with the two taxi drivers in pursuit.

Saldana then jumped out of the slowly moving Malibu and fired a gun at the taxis, shattering the driver's window and putting bullet holes in the door and left front bumper of Green's cab and hitting the driver's side of Neufville's car. Green eventually saw some police officers to whom he described the Malibu.

After the accident and the shooting, the four men drove to the apartment of Dolores Dubois and Donnel Brown. They were acquainted with Brown through Kareem C'Allah, Dubois' son. According to Brown, they were heavily armed: Shakur and Saldana were both carrying .357 magnums and Latine was carrying a shopping bag that contained a sawed-off shotgun, a .45 caliber pistol (which he handed to Thomas), and a green gun-cleaning kit. Shakur explained that they had been in an accident. Saldana added that he had shot at the cabs to prevent them from following them. Ms. Dubois became upset that the men had brought guns into the apartment, and ordered them to leave, giving them $3.00 to take a taxi.

In the meantime, officer Joseph Monteleone and Sergeant Patrick Pellicano who were on patrol in a marked police car received a radio alarm describing the shooting, and the car involved: a 1976 blue Chevrolet Malibu, with license number 242ZHA. At 4:40 a.m., they spotted the stolen Malibu. The officers radioed for assistance, followed the car until it stopped several blocks later and stopped their own car about a car-length away.

The officers then got out of the car with their guns drawn. Officer Monteleone approached the driver's side of the Malibu, while Sergeant Pellicano went up to the passenger side. Both officers testified that at that point, there appeared to be three men in the car: two in the front seat and one alone in the back. As they neared the car the man in the backseat "suddenly" dropped out of sight, and Latine appeared in the rear seat holding a shotgun, which he fired at Sergeant Pellicano through the window. Sergeant Pellicano's face "exploded" and he felt "extreme pain" in his right eye. In addition, his left eye was "full of blood," blinding him. He yelled, "I'm hit, I can't see." Nevertheless, he fired his gun in the direction of the Malibu.

At that point, Jamal Thomas leaped from the driver's seat, empty-handed, and ran. When the rear door on the driver's side opened, Officer Monteleone saw a handgun, a man crouched on the floor, and a man lying on the backseat. He fired six shots, and then returned to the patrol car to reload and to call for help. Sergeant Pellicano was staggering and was "drenched" with blood, and said that he could not see the car. Officer Monteleone ran to him, brought him back to the police car, and then drove him to the hospital.

After the shootings, back-up officers and detectives arrived at the scene. They found two discharged twenty-gauge shotgun shells and one live twenty-gauge shell on the back seat of the Malibu and a fully loaded .45 semi-automatic pistol on the front seat. In addition, they found a .357 magnum next to the front wheel on the driver's side containing three discharged shells and a recently fired twenty-gauge shotgun twenty feet from the front of the car. A plastic bag containing ammunition, a gun-cleaning kit, and a pair of handcuffs were also recovered from the back seat. Brown testified that the guns and cleaning kit resembled the ones that Saldana and the other gunmen had shown him prior to the shooting. Saldana's fingerprints were found on the car, on the handcuffs and on an oil can found in the car.

Sometime during the afternoon of July 3rd, Saldana and Donnel Brown walked together to Edgecomb Park. Brown had seen a television report about the shooting and asked Saldana what happened. Saldana explained that once the car had been stopped and the shooting had begun, Latine had refused to shoot at the officers. Saldana claimed to have aimed his pistol at Latine's head and ordered him to "open fire."

After Latine fired the shotgun, which was fortunately loaded only with birdshot, Saldana said he heard one officer yell "I'm hit, I'm hit" and the other say, "Sarge, are you hurt?" Saldana then fled from the car leaving his empty gun behind.

Saldana stated that if the police came for him, he would "shoot it out" with them. During the next few days, Brown relayed messages between the gunmen. During this time, Saldana advised him that the police had confiscated photographs of them from a friend's girlfriend and knew who they were.

We do not know what Saldana could have testified to before the grand jury. At trial he chose not to take the stand. At most, he could have claimed that he had no part in Latine's shotgun blast at Sergeant Pellicano. Against this were his admissions to Brown that he forced Latine to shoot, and other circumstantial evidence of his presence at the scene.

Had Saldana testified before the grand jury he would have been cross-examined about his criminal record. The State advises us that Saldana was convicted in 1971 for two separate robberies, and in 1974 for criminal possession of a weapon. Apparently his conviction for federal bank robbery, for which he is now serving a sentence, did not occur until after his indictment for attempted murder. It passes the bounds of credulity to believe that by his testimony Saldana could have helped himself in any respect. Any defense counsel would have strongly advised Saldana not to appear. In fact, Saldana's brief to the Appellate Division indicates that his defense lawyer so advised him. At best, his appearance would have crippled his defense at trial.

In short, we conclude that under the federal constitutional standard Saldana was in no way prejudiced by not being given the opportunity to appear before the grand jury.

Reversed; the petition is dismissed.