KEVIN JAMES LISLE, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 28172

April 24, 1997                                    937 P.2d 473

*Morgan D. Harris,* Public Defender and *Michael L. Miller,* and *Ralph E. Baker,* Deputy Public Defenders, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney and *Stacy Kollins, and Daniel M. Seaton,* Deputy District Attorneys, Clark County, for Respondent.

# OPINION

*Per Curiam:*

## FACTS

On the evening of October 22, 1994, Joey Gonzales and Kip Logan bought two beers and then headed towards Logan's girlfriend's house. As Logan drove on U.S. Interstate Highway 95, a white van approached his Mustang. Gonzales observed the van's front passenger stick his head and arm out of the window and scream at them. Gonzales told Logan, "Let's just go," and took a swig of his beer. At that moment, Gonzales heard the driver-side window break. He turned and saw Logan slumped over the steering wheel. Gonzales grabbed the steering wheel and stopped the Mustang.

Metro police officer Steve Borden and his partner, Mike Carreia, arrived as Gonzales was pulling Logan out of the Mustang. Officer Borden saw that Logan had been shot in the head. He checked Logan for vital signs, and saw none.

Gonzales told Borden that he saw three males in an Aerostar-type van, Hispanic or white, with shaved heads. Gonzales said that the shooter had a goatee, and that the back-seat passenger appeared more white.

On the next day, a medical examiner determined that Logan had died of a gunshot wound to his head. Fragments of a bullet consistent with a .357 Magnum were removed from Logan's head.

On the same day, John Melcher was arrested. He denied being in the van on the previous night.

On October 27, 1994, Anthony Evans was arrested. That evening, he gave a statement that Melcher was in the front passenger seat of the van, and that the shot came from the front passenger side. He said that after the shooting, "Shotgun" (Melcher) disposed of the gun.

On October 31, 1994, the defendant, Kevin James Lisle, was arrested.

On April 6, 1995, Evans agreed to testify against Lisle and Melcher in exchange for the State reducing his charges to accessory after the fact of murder. Evans agreed to testify both in the Logan case and in another homicide case involving Lisle ("the Lusch case"). On May 23, 1995, Evans was released from custody.

Sometime after Evans agreed to cooperate with the State, Melcher sought the same deal. On July 24, 1995, he was inter-

viewed by detectives. His charges were later reduced to accessory after the fact of murder. His case was transferred to juvenile court and he received probation.

On October 9, 1995, an amended indictment was filed charging Lisle with one count of murder with use of a deadly weapon and one count of attempted murder with use of a deadly weapon. A jury trial commenced on October 16, 1995.

*Guilt phase*

At trial, Evans testified that on the night of October 22, 1994, he, Melcher, and Lisle were at Larry Prince's apartment. Evans, Melcher, and Lisle decided to borrow a white van from Prince, and Melcher picked up the keys to the van. As Lisle got into the front passenger seat of the van he said, "I hope nobody messes with us tonight, because I'm drunk and I do crazy things when I'm drunk." Lisle was holding a .357 handgun.

Evans testified that Melcher drove the van, Lisle was in the front passenger seat, and he was in the rear passenger seat. Lisle was hanging out the window and throwing gang signs at cars. Evans heard Lisle tell Melcher, "speed up," and the van pulled up to a Mustang. Evans observed Lisle pull out his gun and point it out of the window, and then Evans heard a gun shot and saw sparks fly. Evans then saw the Mustang pull over to the side of the road, saw that the Mustang's driver-side window was shattered, and saw the driver lying against the steering wheel. Evans stated that he did not know whether there was anyone else in the Mustang besides the driver. Evans testified that after the gunshot, Lisle directed Melcher to get off the freeway and to stop the van. Lisle then disposed of the gun.

On redirect, Evans testified that he was a member of the North Hollywood Boyz, and Lisle was a member of the Westside Lompoc, both California gangs. He stated that he had known Lisle for two years and Melcher for two months. He stated that Melcher was not a gang member. Evans said that gang members have a rule "not to tell on none of your friends." He testified that he was afraid of Lisle.

Prince testified that while living in Las Vegas, he became familiar with Evans, Melcher and Lisle. He stated that he had rented a van for their use, and that Lisle drove it more than anyone else. Prince admitted that he testified in this case pursuant to a plea bargain on a drug possession charge.

The grand jury testimony of Tom Foster was read. On the night of the shooting, Foster observed three males exit from a white van. Foster testified that he was positive that Lisle was the driver of the van. Foster identified Melcher as a passenger.

Detective Diane Falvey testified that on the day of Evan's arrest he had indicated that Melcher was the shooter, but she

suspected he was not giving the right information. Detective Donald Tremel testified that when Melcher was arrested, Melcher told him that Lisle was driving the van.

Melcher testified that he had no gang affiliation. He stated that he did things for Lisle, such as "drive the car around," in exchange for clothes and money. Melcher stated that on the evening of October 22, 1994, he was driving the white van on the freeway.

Melcher testified that while he was in custody, he saw Lisle at the detention center. Lisle told him "that he looked Logan in the eye before he killed him and he enjoys it and that after I do my first one I will see what he is talking about." Lisle also told him that the police believed Melcher was the shooter, and told him to take the blame for the shooting. Melcher stated that he was aware of the gang code of conduct, "if you snitch, you die," and that he had been afraid of retaliation.

Melcher also testified that he could not grow a beard.

Sophia Martinez testified that at approximately 3:00 a.m. on October 23, 1994, Lisle told her that he had done something crazy, and to watch the news. At that time, Lisle had a mustache but no hair on his chin. She had never seen Melcher with a mustache or a goatee. She saw Lisle with a shaved face later that day.

Christopher Barnes, testifying for the defense, stated that after hearing about the shooting he contacted the police, because he had been assaulted by individuals of a similar description. He identified a photograph of Melcher as one of his assailants. However, he acknowledged that although he had believed his assailant had lighter skin than himself, Melcher's skin was darker than his. He was shown a photo of Lisle but did not recognize him as having been involved in the incident. He described his assailant as having "a little bit of rough around the chin and the moustache," what he would call a goatee.

David Hermanson, Melcher's cellmate, stated that Melcher had admitted to him that he was trying to shoot the passenger but missed and hit the driver.

On October 20, 1995, the jury returned a verdict of guilty for both the murder and the attempted murder charges.

*Penalty phase*

On October 24, 1995, the State filed its intent to seek the death penalty based on the aggravating circumstance that the murder was committed by a person who knowingly created a risk of death to more than one person by means of a weapon, device, or course of action that would normally be hazardous to the lives of more than one person. The district court granted Lisle's motion for a

mistrial on attempted murder, but denied a motion for mistrial for the murder charge.

During the penalty phase, several witnesses implicated Lisle in the Lusch case.

On October 26, 1995, the jury returned a sentence of death. On February 1, 1996, the judgment of conviction and a warrant of execution were filed. This appeal followed.

## DISCUSSION

*Whether the State violated Brady v. Maryland by failing to disclose a confession by the defendant and other material*

Lisle contends that the State failed to disclose a statement made by Melcher that included a confession by Lisle and impeachment evidence until after trial, in violation of his right to due process.

On July 24, 1995, Melcher gave a taped statement to police that Lisle now contends constitutes a "highly inflammatory and provocative confession" by himself to Melcher. Lisle argues that the State's failure to disclose this statement left him unable to prepare for Melcher's in-court testimony that Lisle confessed to Melcher. Lisle argues that this nondisclosure violates the holding in Brady v. Maryland, 373 U.S. 83 (1963), that the suppression of evidence favorable to the accused by the State violates due process where the evidence is material either to guilt or punishment. *Id.* at 87.

Where the defense makes no request or only a general request for evidence, " 'if the omitted evidence *creates a reasonable doubt which did not otherwise exist,* constitutional error has been committed.' Under this standard, evidence is material if there is a reasonable probability that the result would have been different if the evidence had been disclosed." Jimenez v. State, 112 Nev. 610, 619, 918 P.2d 687, 692 (1996) (citations omitted) (quoting Roberts v. State, 110 Nev. 1121, 1128, 881 P.2d 1, 5 (1994)).

The confession Lisle contends was suppressed supports the State's case; thus, Lisle's contention that it constitutes evidence "favorable to the accused" is a novel interpretation of *Brady*. Moreover, Melcher and Evans were present at the homicide, and their testimony corroborated Lisle's confession that he fired at the Mustang. Thus, Lisle's confession to Melcher *supports* eyewitness evidence that Lisle shot Logan, and it does not appear a "reasonable probability" that disclosure would have affected the outcome of the trial.

Lisle further argues that Melcher's statement included impeachment evidence that should have been disclosed by the

State. In the statement, Melcher admitted that he was a gang member and that he was called "Shotgun." Lisle argues that the State "took advantage of the fact the Defendant did not have the 10:17 a.m. statement to infer that the code of silence kept gang members from snitching on other gang members and that is why Evans initially chose to point the finger at non-gang member Melcher."

In the statement, Melcher admitted to being an "enforcer" for Lisle and to doing drug deals. Melcher also admitted that he had accosted Barnes, who testified that he had been accosted by a person with a goatee. Melcher purportedly could not grow a goatee. Lisle argues that this statement is material to the identity of the perpetrator in the instant case.

The State contends that the undisclosed impeachment evidence is cumulative of evidence by which Melcher was impeached at trial, and therefore not material. The United States Supreme Court has "never held that the Constitution demands an open file policy," Kyles v. Whitley, 514 U.S. 419, 437 115 S.Ct. 1555, 1567 (1995); accordingly, a prosecutor must "gauge the likely net effect of all such [favorable] evidence and make disclosure when the point of 'reasonable probability' is reached." *Id.* Thus, although the undisclosed evidence must be evaluated item by item to determine its importance, the collective effect of the items determines whether or not the nondisclosure violates *Brady*. *Id.* at 1567-68, 1567 n.10. "Undisclosed impeachment evidence can be immaterial because of its cumulative nature only if the witness was already impeached at trial by the same kind of evidence." U.S. v. Cuffie, 80 F.3d 514, 518 (1996).

Each piece of allegedly undisclosed impeachment evidence corroborates similar evidence introduced at trial. Furthermore, this evidence has little or no impeachment value. We conclude that the cumulative effect of this evidence is not material.

*Whether prosecutorial misconduct was committed when the prosecutor ordered witness Melcher not to discuss any matters with the defense attorneys unless it was in the State's presence and with the State's permission*

Lisle contends that the State attempted to control an interview of Melcher and instructed Melcher not to talk to defense counsel, violating both Lisle's right to due process and SCR 173, Fairness to opposing party and counsel, sections 1 and 6.

The jury verdict was filed on October 25, 1995. The interview with Melcher took place after trial, on November 1, 1995. Therefore, the prosecutor's actions did not frustrate defense counsel's efforts to prepare a defense. We conclude that any misconduct on the part of the prosecutor at this interview did not violate Lisle's right to due process.

SCR 173 contemplates misconduct before or during trial. *See* Sipsas v. State, 102 Nev. 119, 716 P.2d 231 (1986). As the conduct complained of here did not prejudice the trial, it is unnecessary to discuss whether this rule was violated.

*Whether the defendant was properly served with notice of the grand jury proceedings against him*

Lisle alleges that on October 31, 1994, he was taken into a room in the police station. There, a woman threw a piece of paper across the table in front of him and said, "You've been subpoenaed," but because he was handcuffed to a chair, he could not read the paper. He was not informed of its contents, which apparently included notice of a grand jury proceeding.

Two days later, on November 2, 1994, Lisle appeared in justice court and was given actual notice that the State would be presenting evidence to the grand jury in an effort to indict him for murder. On the next day, November 3, 1994, the grand jury proceedings took place.

On December 19, 1994, Lisle filed a motion to dismiss on the grounds that he was given inadequate notice of the proceeding. He submitted minutes of his justice court appearance as proof that he received only one day's notice. The State's response included an affidavit from a detective stating that notice was mailed to Lisle's last known address on October 26, 1994, seven days before the grand jury proceeding, and that a copy of the notice was given to Lisle upon his arrest.

Lisle argues that an evidentiary hearing should have been held to resolve the conflict between the detective's affidavit and his evidence of receiving only one day's notice. He argues that he was denied due process of law because a hearing was not held to evaluate the credibility of the witnesses. He did not file a motion for an evidentiary hearing regarding this matter.

A district court's determinations of fact will not be set aside unless they are clearly erroneous. Hermann Trust v. Varco-Pruden Building, 106 Nev. 564, 566, 796 P.2d 590, 592 (1990).

In Johnston v. State, 107 Nev. 944, 822 P.2d 1118 (1991), the defendant had sought a writ of habeas corpus, arguing that the State had failed to give him notice of a grand jury hearing. This court stated:

> At the pretrial hearing, all parties agreed that it was a matter of credibility of the witnesses as to whether Johnston received the required "Marcum Notice." Johnston testified that he was never given notice, either orally or in writing. The State produced four witnesses, however, to support its contention that Johnston received notice of the proceeding. Therefore, we conclude that the district court did not abuse its discretion in finding in favor of the State.

*Id.* at 946, 822 P.2d at 1120.

"Where . . . something more than a naked allegation has been asserted, it is error to resolve the apparent factual dispute without granting the accused an evidentiary hearing." Vaillancourt v. Warden, 90 Nev. 431, 529 P.2d 204 (1974) (remanding for an evidentiary hearing where defendant filed four affidavits to support claim that he pleaded guilty in return for a promise from the prosecutor's office).

It appears that the district judge, relying upon the detective's affidavit, determined that Lisle received at least three day's notice of the proceeding. *Johnston* suggests that an evidentiary hearing would have been appropriate. Lisle did not submit four affidavits, as in *Vaillancourt,* but did provide more than a naked allegation. We conclude that the district court abused its discretion in failing to hold an evidentiary hearing.

Lisle further argues that because he was not given adequate notice of the grand jury proceedings against him, the grand jury lacked jurisdiction to indict him.

The State argues that the issue of inadequate notice must be raised by extraordinary writ, and cannot be entertained on direct appeal. Alternatively, the State argues that Lisle received reasonable notice.

At a pretrial hearing, the district judge denied Lisle's petition for writ of habeas corpus. The district judge discussed Sheriff v. Marcum, 105 Nev. 824, 783 P.2d 1389 (1989), and there was some confusion over whether *Marcum* notice required five days, or whether anything more than one day was adequate.

In *Marcum,* the district court had granted the defendants' petition for a writ of habeas corpus for failure to receive reasonable notice of the grand jury proceedings at which they were indicted. The district court stated that five days' notice was reasonable, but one day's notice was unreasonable. *Id.* at 825-27,

783 P.2d at 1390-91. This court affirmed, noting that since a defendant has a right to testify in front of a grand jury, he also has a right to notice. *Id.* at 826, 738 P.2d at 1390-91; *but see* Gordon v. Ponticello, 110 Nev. 1015, 879 P.2d 741 (1994) (the right to testify at a grand jury proceeding is limited).

Apparently, Lisle was mailed notice seven days prior to the grand jury proceeding. It is not clear that he received this letter. When the district court stated "five days wasn't given here," it appears to have been referring to Lisle's arrest three days prior to the hearing.

A writ of mandamus is an appropriate remedy for inadequate notice of a grand jury hearing. Solis-Ramirez v. District Court, 112 Nev. 344, 347, 913 P.2d 1293, 1295 (1996). In Sturrock v. State, 95 Nev. 938, 604 P.2d 341 (1979), this court held that a defendant who has been denied his right to a preliminary hearing, and has failed to pursue a pretrial remedy through mandamus, "has waived any impropriety regarding the trial court's inaction." *Id.* at 943, 604 P.2d at 345. We stated,

> In circumstances such as those present in the instant case, where abuse is so patent and deprivation purportedly so crucial to the accused, an extraordinary remedy must be sought, because no post-judgment appeal will be available to review the error complained of, absent compelling reasons.

*Id.*, 604 P.2d at 345.

In People v. Corona, 259 Cal. Rptr. 524, 528-29 (1989) (citations omitted), the court of appeal stated,

> The general rule in California is that a conviction will not be reversed due to an irregularity in grand jury proceedings absent a showing that the irregularity deprived the defendant of a fair trial or otherwise resulted in actual prejudice relating to the conviction. Absent a possibility of prejudice it is unnecessary to decide the merits of a claim of irregularity. Any right to relief without a showing of prejudice is limited to a pretrial challenge by extraordinary writ.

Similarly, the Second Circuit dismissed a petition for a writ of habeas corpus where a state court's failure to allow a defendant to testify before a grand jury was harmless beyond a reasonable doubt. Saldana v. State of N.Y., 850 F.2d 117 (2nd Cir. 1988).

This court cannot determine whether Lisle received reasonable notice because the district court failed to hold an evidentiary hearing to determine when Lisle was given notice. Nonetheless, Lisle failed to seek a writ of mandamus and has subsequently

failed to demonstrate any prejudice resulting from inadequate notice. We conclude that Lisle has no right to relief from this alleged error and further conclude that the district court had jurisdiction to try the defendant.

*Whether the defendant was denied a fair trial due to repeated improper comments to the jury by the prosecutors*

Lisle argues that the prosecutors made prejudicial remarks to the jury during both the guilt and the penalty phases of trial, in violation of his right to due process. Lisle did not object to the remarks at trial, except for statements concerning his drug use. "As a general rule, the failure to object, assign misconduct, or request an instruction, will preclude appellate consideration. However, where the errors are patently prejudicial and inevitably inflame or excite the passions of the jurors against the accused, the general rule does not apply." Garner v. State, 78 Nev. 366, 372-73, 374 P.2d 525, 529 (1962) (citations omitted).

*Garner* further stated, "[i]f the issue of guilt or innocence is close, if the state's case is not strong, prosecutor misconduct will probably be considered prejudicial." *Id.* at 374, 374 P.2d at 530; *cf.* Lay v. State, 110 Nev. 1189, 1194, 886 P.2d 448, 451 (1994) ("[W]here evidence of guilt is overwhelming, prosecutorial misconduct may be harmless error.").

### 1. *Guilt phase*

The prosecutor has a duty to refrain from stating facts in his opening statement that he cannot prove at trial. Riley v. State, 107 Nev. 205, 212, 808 P.2d 551, 555 (1991), *cert. denied,* 514 U.S. 1052, 115 S.Ct. 1431 (1995), *citing Garner,* 78 Nev. at 371, 374 P.2d at 528. "Evidence of other offenses is universally regarded as prejudicial and is therefore admitted into evidence only for certain specified purposes, NRS 48.045(2), and only then when its probative value outweighs its prejudicial effect." Theriault v. State, 92 Nev. 185, 189, 547 P.2d 668, 671 (1976), *overruled on other grounds,* Alford v. State, 111 Nev. 1409, 906 P.2d 714 (1995).

In the opening statement, the prosecutor stated that Lisle's family were gang members. This was not shown at trial; however, the fact that Lisle himself was a gang member, and had gang member friends, was in evidence. The prosecutor stated that

Lisle was smoking marijuana on the night of the shooting. Lisle's drug use was not brought up during trial, but may have been relevant to show state of mind. The statement that Lisle was "looking for trouble" was supported by testimony at trial. The prosecutor also stated, "He, like all criminals, made the mistake of turning into a cul-de-sac." This statement goes beyond what the prosecutor could prove at trial; nonetheless, we conclude that it constitutes harmless error. We conclude that none of the prosecutor's statements within the opening statement constitutes reversible error.

During rebuttal closing argument, the prosecutor referred to negotiations he had with Melcher and Evans before they pled guilty to lesser charges. Lisle argues that the prosecutor improperly injected his opinion or personal beliefs into his argument, tendered his own credentials, and vouched for the credibility of government witnesses.

> It is improper for the prosecution to vouch for the credibility of a government witness. Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony.

United States v. Roberts, 618 F.2d 530, 533 (1980).

"Analysis of the harm caused by vouching depends in part on the closeness of the case." U.S. v. Frederick, 78 F.3d 1370, 1378 (9th Cir. 1996); *see also Roberts* at 534 (improper to imply that a witness not called could support a chief witness's testimony).

In the present case, the credibility of both Melcher and Evans was critical. The prosecutor did appear to refer to information known by him but not presented to the jury as to the content of the negotiations between himself and Melcher, and himself and Evans. Moreover, the prosecutor's statements may have suggested that the prestige of the government was behind the witnesses. However, the prosecutor did not make any affirmative misrepresentations; the fact of his negotiations with Melcher and with Evans was in evidence, and Melcher and Evans were cross-examined about these negotiations.

Also, Lisle contends that the prosecutor improperly commented on his failure to call witnesses to impeach Melcher and Evans. We agree. It is improper to suggest to the jury that it is the defendant's burden to produce proof by explaining the absence of

witnesses or evidence. *Barron v. State*, 105 Nev. 767, 778, 783 P.2d 444, 451 (1989).

### 2. *Rebuttal penalty phase argument*

Lisle contends that the prosecutor improperly suggested to the jury that it align itself with the prosecution by referring to "we" and "us".

For the most part, the prosecutor's use of "we" and "us" is rhetorical, and therefore not improper. However, the statement, "There is only one human being in this world that causes us to be here today doing this terrible thing we have to do. And his name is Kevin Lisle," improperly suggests that the jury is aligned with the prosecution.

Lisle contends that the prosecutor improperly told the jury that it must be "accountable" and "do the right thing." In *Domingues v. State*, 112 Nev. 683, 917 P.2d 1364 (1996), *cert denied*, ...... U.S. ......, 117 S.Ct. 396 (1996) (No. 96-5797), the prosecutor stated, "This is the time for accountability and responsibility. Death is the only appropriate sentence in this case. Anything less is disrespectful to the dead and irresponsible to the living." *Id.* at 698, 917 P.2d at 1375. This court held that this statement did not amount to prosecutorial misconduct. *Id.* Similarly, here, we conclude that the prosecutor's remarks to the jury concerning accountability do not constitute prosecutorial misconduct.

We conclude that several of the prosecutor's remarks were improper, but we further conclude that none was patently prejudicial and none would have affected the jury verdict.

*Whether there was sufficient evidence to convict defendant of the offense of murder with use of a deadly weapon and whether the district court erred in denying defendant's motion for a mistrial based on the argument that the totality of conflicting evidence failed to prove guilt beyond a reasonable doubt*

Lisle filed a motion for mistrial as to both murder with use of a deadly weapon and attempted murder with use of a deadly weapon, and the court granted his motion as to the attempted murder charge. Lisle argues that the evidence is not sufficient to support the jury's finding that he was guilty of murder with use of a deadly weapon. He argues that the only evidence of his guilt is the uncorroborated and impeachable testimony of Melcher and Evans.

Evans' testimony at trial implicating Lisle contradicted earlier

statements identifying Melcher as the front seat passenger. Both Gonzales and Foster identified Melcher but failed to identify Lisle. Also, Melcher changed his version of the events. He originally stated that he was not in the van, and later said that he was the driver and Lisle was the front seat passenger.

The standard of review for sufficiency of evidence in a criminal case is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Lay v. State, 110 Nev. at 1192, 886 P.2d at 450. "[I]t is for the jury to determine what weight and credibility to give various testimony." Hutchins v. State, 110 Nev. 103, 107, 867 P.2d 1136, 1139 (1994) (affirming judgments of conviction based primarily on the testimony of a sexual assault victim).

Melcher's and Evans' trial testimony implicating Lisle was consistent. Moreover, contrary to Lisle's contentions, additional evidence in the record corroborates Melcher's and Evans' testimony. Prince testified that Lisle owned a .357 Magnum and would not let anyone else use it. Prince also testified as to Lisle moving out of Prince's house the day after the shooting, and saying that it was "getting too hot." Martinez testified that five hours after the shooting, Lisle told her he had done something crazy.

We conclude that the jury had sufficient evidence to find Lisle guilty of murder beyond a reasonable doubt, and therefore the district court properly denied Lisle's motion for mistrial.

*Whether the district court committed reversible error when it allowed the jury to consider as an aggravating circumstance that the murder was committed by a person who knowingly created a great risk of death to more than one person*

Lisle argues that the district court applied NRS 200.033(3)[1] in an overly broad manner, violating the Constitution. Lisle contends that this aggravator fails because there was insufficient evidence to indicate (1) that at the time the single shot was fired

---

[1]NRS 200.033 states, in pertinent part:

The only circumstances by which murder of the first degree may be aggravated are:

. . . .

(3) The murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person.

he knew there was a passenger in the vehicle, and (2) that the single shot placed another person at great risk of death.

First, Lisle contends that there was insufficient evidence to indicate that he knew Logan had a passenger. Evans testified that he did not see a passenger in the Mustang. However, Gonzales was able to see the front and rear passengers in the van.

Second, Lisle contends that "a great risk of death to more than one person" requires a high probability of harm to others, not a mere possibility of harm. He cites a number of cases from Florida and Georgia to support his argument that a high probability of harm to others was not present here.

In Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985), the defendant knowingly created a great risk of death to more than one person where the victim's wife was in the line of fire. *Id.* at 243, 699 P.2d at 1056.

In the instant case, Lisle fired his revolver at Logan from a fairly close range while the two vehicles were moving. Unlike *Nevius,* Gonzales was not between Lisle and Logan, but he was sitting just beyond Logan, the target.

We conclude that sufficient evidence supports the finding of this aggravating circumstance, and its application in this context is not overbroad.

*Whether prejudicial error occurred when the jury was instructed on the appropriate use of the character evidence presented by the prosecution during the penalty phase*

Lisle argues that the jury instructions during the penalty phase were ambiguous and led the jury to rely improperly on his character and his unadjudicated murder charge in finding him death-eligible. Lisle contends that nothing prevented the jury from considering character evidence along with aggravating and mitigating evidence in arriving at the death penalty option. He argues that the evidence presented by the State at the penalty hearing was solely evidence of his bad character, and the jury should have been instructed not to consider this evidence until after it weighed the aggravating and mitigating circumstances.

When a sentencing body is given discretion to impose the death sentence, "that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. 153, 189 (1975) (Opinion of Stewart, Powell, and Stevens, JJ.), *reh'g denied,* 429 U.S. 875 (1976). In *Gallego v. State,* this court explained the process by which a Nevada jury arrives at a sentence of death. 101 Nev. 782,

711 P.2d 856 (1985), *cert. denied,* 471 U.S. 871 (1986) (where jury was instructed not to consider evidence of uncharged homicides as aggravating circumstance, such evidence was relevant to the considerations of defendant's death worthiness). "Individuals who are identified as potential recipients of the death penalty because of conduct statutorily defined as an aggravating circumstance must then be scrutinized according to their individual characteristics." 101 Nev. at 791, 711 P.2d at 862.

In the present case, the jury was clearly instructed that it must find an aggravating circumstance before the death penalty was an option, and the aggravator was defined. Instruction 8B clearly states that evidence of other crimes is not to be considered as an aggravator.[2] We conclude that the instructions to the jury regarding the use of character evidence minimized the risk of arbitrary and capricious action, and no prejudicial error occurred.

*Whether the trial court committed prejudicial error when it allowed the State to present to the jury evidence concerning an unadjudicated murder case during the penalty hearing*

Lisle argues that the district court erred by allowing the State to present evidence concerning an unadjudicated murder case before the jury advised the court that it had found an aggravating circumstance beyond a reasonable doubt. Lisle contends that because this evidence was presented in conjunction with aggravating and mitigating circumstances, the district court had no way of determining whether the aggravator was found. Moreover, Lisle contends that the evidence is prejudicial and unreliable. He argues that introduction of the evidence prior to establishing that the jury found the aggravating circumstance beyond a reasonable doubt violated his right against cruel and unusual punishment and his right to due process.

The district court has broad discretion to admit evidence at a penalty hearing for first-degree murder under NRS 175.552. In Riker v. State, 111 Nev. 1316, 905 P.2d 706 (1995), *cert. denied,* ....... U.S. ......., 116 S.Ct. 1687 (1996), this court stated, "evidence of uncharged crimes may be admitted during a penalty hearing only after any aggravating circumstances have been established beyond a reasonable doubt." *Id.* at 1326, 905 P.2d at

---

[2]Penalty phase instruction 8B reads:

> The State has alleged one statutory aggravating circumstance against Kevin Lisle. Other arrests, convictions, or pending charges against Mr. Lisle are to be considered for character only and not as aggravating circumstances.

712, citing Guy v. State, 108 Nev. 770, 782, 839 P.2d 578, 586 (1992). This court then explained that "it does not necessarily follow that the trier of fact cannot hear the evidence of uncharged crimes before it considers the aggravating circumstances, only that the uncharged crimes cannot be used to prove the aggravating circumstances." *Id.* at 1327, 905 P.2d at 713.

In the present case, evidence of the uncharged homicide was presented before the jury submitted its decision regarding the aggravating circumstance. The jury was instructed not to consider other crimes or pending charges as aggravating circumstances. There is a presumption that jurors follow jury instructions. Tennessee v. Street, 471 U.S. 409, 415 (1985). Accordingly, we conclude that the district court did not err in allowing the State to present evidence of the unadjudicated murder before the jury advised the court that it had found an aggravating circumstance beyond a reasonable doubt.

*Whether the defendant's right to due process of law was violated when the trial court failed to continue the arraignment as statutorily mandated under NRS 172.225(4)*

Lisle contends that his right to due process of law was violated when the district court refused to grant his motion for a continuance of his arraignment. NRS 172.225(4) provides that "any defendant to whom a copy [of the grand jury transcript] has not been delivered is entitled upon motion to a continuance of his arraignment until a date 10 days after he actually receives a copy." Lisle did not receive a copy of the grand jury transcript before his arraignment.

Lisle has failed to show any prejudice resulting from the district court's failure to grant a continuance of his arraignment. *See* Snyder v. State, 103 Nev. 275, 280, 738 P.2d 1303, 1306 (1987) (finding that defendant's failure to plead at a formal arraignment "did not deprive him of any substantial right, nor did it change the course of his trial"). Accordingly, we conclude that the district court's failure to comply with NRS 172.225(4) did not deny Lisle his right to due process of law.

*Whether the defendant's conviction must be reversed because of the cumulative effect of errors*

Lisle argues that numerous errors in this case violate his rights and damage the integrity of the justice system, thereby mandating reversal of his conviction.

If the cumulative effect of errors committed at trial denies the appellant his right to a fair trial, this court will reverse the conviction. Relevant factors to consider in deciding whether error is harmless or prejudicial include whether "the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged."

. . . Evidence against the defendant must be substantial enough to convict him in an otherwise fair trial, and it must be said without reservation that the verdict would have been the same in the absence of error.

Homick v. State, 112 Nev. at 316, 913 P.2d at 1288 (citing Big Pond v. State, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985)).

Upon a review of the record, we conclude that the verdict would have been the same in the absence of error.

Finally, NRS 177.055(2) compels this court to address whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor. We conclude that the record contains sufficient evidence upon which the jury could have found that the aggravating circumstance outweighed any mitigating circumstances, and thus the death sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor.

## CONCLUSION

We conclude that the effect of any errors in this case was insufficient to justify overturning Lisle's conviction or his sentence of death. Sufficient evidence supports the jury's finding that Lisle committed murder with use of a deadly weapon. Accordingly, we affirm the conviction and sentence.[3]

---

[3]The Honorable A. William Maupin, Justice, did not participate in the decision of this appeal.