OPINION
By the Court,
Pickering, C.J.:
Appellant Deyundrea “Khali” Holmes appeals his conviction of first-degree murder and robbery. He argues that the fairness of his trial was compromised by the district court’s erroneous admission into evidence of: (1) inflammatory rap lyrics Holmes wrote while in jail in California; (2) a coconspirator’s out-of-court statement that Holmes “went off” and “just started shooting”; and (3) un *570 warned statements that Holmes made to the Nevada detectives who interviewed him in California before his arrest. We reject these and Holmes’s other assignments of error and affirm.
I.
Kevin “Mo” Nelson was a drug dealer who operated out of a recording studio in Reno, Nevada. Holmes plotted with Max Reed and others, including Jaffar “G” Richardson, to steal drugs and money from Nelson. The night of the robbery, Holmes and Reed went to the studio. No one was there, so Reed called Richardson, who regularly did business with Nelson, and asked Richardson to call Nelson and lure him to the studio on the pretense of a methamphetamine sale. Soon after Richardson made the call, Nelson arrived with a friend, Kenny Clark.
Two men wearing ski masks and black clothes (later identified as Holmes and Reed) accosted Nelson and Clark in the studio’s parking lot. Nelson tried to fight them off. At one point the fight moved into Clark’s SUV, where Nelson managed to stash his money and drugs under the passenger seat. In the fight, Nelson’s pockets were “bunny-eared” (turned inside out). His assailant tore off Nelson’s shirt and chain necklace, pistol-whipped him, and then tried to drag Nelson from the parking lot into the studio without success. Frustrated, Nelson’s assailant removed his ski mask and said, “I’m going to shoot this f@#$ing guy,” which he did. Nelson staggered, then fell and died. Clark managed to call 911 and flee.
The police investigated and took witness statements from Clark and other eyewitnesses, but could not initially identify the two assailants. They did find a fresh, unweathered cigarette butt near the scene, from which the crime lab extracted a DNA sample. But the sample did not produce a database match, so the case went cold.
Three years later, a routine database search matched the DNA from the cigarette to a sample Holmes gave California parole authorities. Nevada detectives traveled to California to interview Holmes at his parole officer’s office. Holmes denied having been to Reno except once for “Hot August Nights”—Nelson was killed on a snowy November night. The detectives arrested Holmes and charged him with murder and robbery. While in jail awaiting extradition, Holmes wrote 18 rap songs, a stanza from one of which was admitted, over objection, at his trial.
The State presented its case through detectives, eyewitnesses, including Clark,[1] and various associates of Holmes and Reed. The *571 evidence established that Holmes came to Reno from Oakland two months before, and vanished right after the crime. A young woman testified that she drove Holmes and Reed from her brother’s house to Nelson’s studio that night. After dropping them off, she waited for them, as requested, on a side street nearby. When Holmes and Reed returned, they were agitated and urged her to “go, go.” On the ride back to the brother’s house, Holmes kept muttering, “he wouldn’t quit moving”; she also overheard Reed place a cell phone call and say, “come get me, something [bad] just went down.” The young woman’s brother, who was on house arrest, testified that when his sister returned with Holmes and Reed, Holmes had a chain necklace wrapped around his hand and a cell phone, neither of which he’d had before. The brother also testified that he overheard Holmes call Richardson and say, “Man it’s all bad, I need to get up out of here.” Not long after, Richardson arrived, then left with Reed.
Richardson also testified. He did so pursuant to a plea agreement, under which he was convicted of, and served time for, conspiring with Holmes and Reed to rob Nelson, and other, unrelated crimes. Richardson was a generation older than Reed and Holmes. He testified that he, Reed, and Holmes had discussed robbing Nelson and that, at Reed’s request, he called Nelson to lure him (and his cash and drugs) to the studio the night of the crime. According to Richardson, he went to the getaway driver’s brother’s house after the murder/robbery because Reed called, said that, “It went wrong,” and asked to talk “face to face.” Richardson then drove Reed past Nelson’s studio to view the scene; police and ambulance personnel were still there when they drove by. In the car, Reed told Richardson that “Khali [Holmes] went off and he don’t know what happened. Khali just started shooting him.” Richardson also testified that the morning after the shooting, he drove Holmes to the Greyhound bus station and gave him money to leave town. Richardson testified that Holmes told him not to trust Reed.
The jury found Holmes guilty of robbery and first-degree murder, both with the use of a deadly weapon. Holmes timely appealed.
n.
We review Holmes’s claims of evidentiary error under an abuse of discretion standard. Lamb v. State, 127 Nev. 26, 41 n.7, 251 P.3d 700, 710 n.7 (2011). “[T]n determining the relevance and admissibility of evidence,” a district court’s discretion is “considerable.” Crowley v. State, 120 Nev. 30, 34, 83 P.3d 282, 286 (2004) (internal quotations omitted). A decision “to admit or exclude evidence will not be reversed on appeal unless it is manifestly *572 wrong.” Archanian v. State, 122 Nev. 1019, 1029, 145 P.3d 1008, 1016 (2006).
A.
Holmes’s first claim of evidentiary error focuses on the district court’s admission of lyrics from “Drug Deala,” a rap song Holmes wrote in jail awaiting extradition to Nevada. The lyrics read:
But now I’m uh big dog, my static is real large. Uh neighborhood super star. Man I push uh hard line. My attitude shitty nigga you don’t want to test this. I catching slipping at the club and jack you for your necklace. Fuck parking lot pimping. Man I’m parking lot jacking, running through your pockets with uh ski mask on straight laughing.
The district court determined that the jury could reasonably view the lyrics as factual, not fictional, and that, if it did, the jury could find that the lyrics amounted to a statement by Holmes, see NRS 51.035(3)(a) (party statements are non-hearsay when offered against the party who made them), that tended to prove his involvement in the charged robbery. So viewed, the lyrics would be both relevant, see NRS 48.015 (“ ‘relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence”), and presumptively admissible, NRS 48.025(1) (with certain exceptions, “[a]ll relevant evidence is admissible”).
The district court acknowledged that admitting gangsta rap carries the risk of it being misunderstood or misused as criminal propensity or “bad act” evidence. See Andrea Dennis, Poetic (Injustice? Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L. & Arts 1, 18, 22, 25-26 (2007) (“gangsta” is a subgenre of rap that “purports to reflect life in the inner city,” draws on devices such as metaphor, braggadocio, and exaggeration for effect, and uses words that may be offensive and prone to misinterpretation by jurors and courts unfamiliar with rap). But it determined that the “probative value” of the “Drug Deala” lyrics was not “substantially outweighed by the danger of unfair prejudice.” NRS 48.035(1). Partly answering Holmes’s concerns, the district court instructed the jury that, “Statements of the defendant [that] have been admitted in evidence . . . may be confessions, admissions, or neither.” It also gave the jury a limiting instruction:
You have heard testimony about certain “rap” song lyrics allegedly written by the defendant while in custody awaiting extradition to Nevada. The evidence of these rap lyrics is not to *573 be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit a crime.[2]
The limiting instruction reiterated that, “You may . . . consider if the above lyrics are confessions, admissions, o[r] neither.”
We recognize, as did the district court, that defendant-authored rap lyrics “may employ metaphor, exaggeration, and other artistic devices,” Dennis, supra, at 14, and can involve “abstract representations of events or ubiquitous storylines.” Id. at 26. But these features do not exempt such writings from jury consideration where, as here, the lyrics describe details that mirror the crime charged. See United States v. Stuckey, 253 F. App’x 468, 482 (6th Cir. 2007) (“Stuckey’s lyrics concerned killing government witnesses and specifically referred to shooting snitches, wrapping them in blankets, and dumping their bodies in the street—precisely what the Government accused Stuckey of doing [to the victim] in this case”; thus, the district court did not abuse its discretion in deeming the lyrics relevant and admissible); Daniels v. Lewis, No. C 10-04032 JSW, 2013 WL 183968, at *10, *12 (N.D. Cal. Jan. 17, 2013) (“The details set forth in the lyrics were sufficiently close to the evidence of the crimes that [they] could be viewed as autobiographical”; they “were fairly admitted as admissions because they constitute direct evidence of [defendant’s] involvement in the crimes charged.” (first alteration in original) (internal quotations omitted)); see Dennis, supra, at 8 (“[overwhelmingly, courts admit defendant-composed rap music lyrical evidence” if direct relevance is shown). It is one thing to exclude defendant-authored fictional accounts, be they rap lyrics or some other form of artistic expression, when offered to show a propensity for violence, as in State v. Hanson, 731 P.2d 1140 (Wash. Ct. App. 1987), on which Holmes relies. It is quite another when the defendant-authored writing incorporates details of the crime charged. As Stuckey notes, “If, in Hanson, the defendant’s writ *574 ings had stated that he robbed a 7-11 and shot the clerk in the abdomen (as the defendant had been accused of doing), surely the case would have come out differently.” 253 F. App’x at 483.
Nor can we accept Holmes’s view that a trial court’s decision to admit or exclude defendant-authored rap lyrics is so fraught with risk of misinterpretation and prejudice that a special rule imposing heightened admissibility requirements is needed. “Rap is no longer an underground phenomenon” but has become “a mainstream music genre.” Stuckey, 253 F. App’x at 484. In this arena, as others, courts should be
. . . unafraid to apply firmly-rooted canons of evidence law, which have well-protected the balance between probative value and prejudice in other modes of communication. Undoubtedly, rap lyrics often convey a less than truthful accounting of the violent or criminal character of the performing artist or composer. . . . [But tjhere are certain circumstances . . . where the lyrics possess an inherent and overriding probative purpose. One circumstance would be where the lyrics constitute an admission of guilt, but others would include rebutting an offered defense and impeaching testimony. Although there is no definitive line that demarcates the amount or content of lyrics that may be used appropriately, reasonableness should govern.
Hannah v. State, 23 A.3d 192, 204-05 (Md. 2011) (Harrell, J., concurring).
It was not unreasonable for the district court to admit the short stanza from “Drug Deala” that it did. Like the lyrics in Stuckey and Daniels, the stanza included details that matched the crime charged. “Jacking” is slang for robbery, The Rap Dictionary, http://www.rapdict.org/Jack (last visited May 23, 2013)—one of the charges Holmes faced. The lyrics’ reference to “jackfing] you for your necklace” may fairly refer to Holmes stealing Nelson’s chain necklace during the robbery. Police never recovered the necklace, but Holmes had a chain necklace after the crime that he did not have before; his knowledge of the necklace as reflected in the lyrics suggests that he knew Nelson and may have participated in the crime. The lyrics also discuss ski masks, a parking-lot jacking of a “drug deala,” and emptying a victim’s pockets—facts about the crime that the State established, particularly through eyewitness Clark.
Holmes counters that these features of “Drug Deala” are so clichéd that they do not distinguish the robbery his lyrics describe from other rapped-about, garden-variety robberies. The lyrics’ lack of originality may reduce but does not eliminate their proba *575 tive value. The extent of the lyrics’ probative value was a matter for cross-examination, argument, or even, perhaps, expert testimony. See Dennis, supra, at 35-36. But so long as evidence has “any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence,” it is “relevant.” NRS 48.015. Here, the similarities between the lyrics and the facts of the charged robbery, as established by the evidence and the timing of the composition after Holmes’s arrest, met the threshold test of relevance.
No doubt the lyrics carried the potential for prejudice. But “[a]ll evidence offered by the prosecutor is prejudicial to the defendant; there would be no point in offering it if it were not.” United States v. Foster, 939 F.2d 445, 456 (7th Cir. 1991). The real question is whether the lyrics’ probative value was substantially outweighed by the danger of unfair prejudice. NRS 48.035; see Schlotfeldt v. Charter Hosp. of Las Vegas, 112 Nev. 42, 46, 910 P.2d 271, 273 (1996) (the “substantially outweigh” requirement “implies a favoritism toward admissibility”). Evidence is “unfairly” prejudicial if it encourages the jury to convict the defendant on an improper basis. State v. Eighth Judicial Dist. Court (Armstrong), 127 Nev. 927, 933, 267 P.3d 777, 781 (2011).
Holmes identifies two potential sources of unfair prejudice: first, jurors unversed in rap may misuse the lyrics as evidence of bad character or criminal propensity, which NRS 48.045(2) forbids; second, jurors may misunderstand the genre and too readily accept artistic expression (read, exaggeration) as autobiographical fact. Unlike Hannah, where the prosecutor examined the defendant about a series of ten rap lyrics he had written, seemingly for no purpose other than to demonstrate that he had a propensity for violence, 23 A.3d at 192-93, 202, only a single stanza from “Drug Deala” was admitted against Holmes—and the stanza that was admitted relayed facts quite similar to the crime charged. Also, the district court crafted and gave an appropriate limiting instruction. Schlotfeldt, 112 Nev. at 46, 910 P.2d at 273; see People v. Wallace, 873 N.Y.S.2d 403, 404 (App. Div. 2009) (affirming conviction based in part on admission of rap lyrics because the trial court gave a limiting instruction to alleviate the potential for unfair prejudice). Thus, the jurors were told that they could consider Holmes’s statements, including the “Drug Deala” lyrics, as “confessions, admissions or neither” and that they could not use the lyrics as evidence of bad character or criminal propensity. So, if the jurors followed the instructions, as we presume they did, Lisle v. State, 113 Nev. 540, 558, 937 P.2d 473, 484 (1997), they only would have considered the lyrics if they found that the lyrics were *576 autobiographical, like a diary or journal entry, and they would not have allowed their feelings about rap music—good, bad, or indifferent—to influence their verdict. Even though the lyrics were prejudicial, the district court did not abuse its discretion in determining that the risk they carried of unfair prejudice did not substantially outweigh their probative value. See Elvik v. State, 114 Nev. 883, 897, 965 P.2d 281, 290 (1998).
B.
Holmes’s second claim of evidentiary error focuses on Richardson’s testimony that Reed told Richardson after the crime that Holmes “went off” and “just started shooting.” Holmes contends that this did not qualify as a non-hearsay statement by a co-conspirator under NRS 51.035(3)(e), because Reed did not make the statement to Richardson “during the course and in furtherance of the conspiracy,” as the statute requires. We reject this claim for two reasons. First, the record does not establish that the error was adequately preserved. Second, the record does not establish an abuse of discretion by the district court in ruling as it did. See Fields v. State, 125 Nev. 785, 795, 220 P.3d 709, 716 (2009) (en banc) (“whether proffered evidence fits an exception to the hearsay rule [is reviewed] for abuse of discretion”).
Some context is helpful. The challenged testimony came toward the end of a series of questions by the prosecutor eliciting what Reed said to Richardson, on the phone and in person, the night of the crime. Initially, the prosecutor asked Richardson what Reed said when he called to see if Richardson could persuade Nelson to come to the studio, to which Holmes interposed a general hearsay objection. The prosecutor responded that “[t]hese are all statements of a coconspirator,” and thus not hearsay; Holmes offered no response, and his objection was overruled. See NRS 51.035(3)(e) (a statement offered against a party is not hearsay when made “by a coconspirator of a party during the course and in furtherance of the conspiracy”). The prosecutor next asked Richardson, without objection, what Reed said to him when he called him after the crime—Richardson responded that Reed said that “[i]t went wrong ... he couldn’t really talk right then, just wanted to see me face to face.” Richardson proceeded to say that he picked Reed up, drove him by Nelson’s studio, and talked to him about “[w]hat happened at the studio.” The prosecutor then asked, without objection: “What did he [Reed] tell you?,” to which Richardson replied, “He said Khali [Holmes] went off and he don’t know what happened. Khali just started shooting.” After two more questions and answers, defense counsel asked to approach the bench. At this point, the record goes dark. It says only: “unreported discussion at the bench between court and *577 counsel.” The record resumes with a statement by the court that, “rather than the defense attorney interposing objections throughout the testimony we have agreed that the court will explain to you that some of these statements are coming in under a legal theory of a co-conspirator, [about which] you will receive further legal instruction.”
NRS 47.040(l)(a) states that “error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection.’ ’ The State argues that “a timely objection” was not made, see 2 Wharton’s Criminal Evidence § 8:32 (15th ed. 1998) (as a general rule, “[i]t is incumbent on counsel to state an objection to a question before the answer is given” because “the question usually indicates if the answer is objectionable or not”); also, that no “motion to strike appears of record.” See 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5037.7, at 749 (2d ed. 2005) (even a permissibly delayed objection “alone does not suffice to preserve an error”; the objector should also move to strike). We would probably reject the State’s argument, if the record adequately established “the specific ground of objection,” NRS 47.040(l)(a), but it does not. This leaves us to speculate as to whether error, still less an abuse of discretion, occurred.
Nevada’s hearsay statute, like its federal counterpart, “contains at least four possible bases for [a hearsay] objection to proffered co-conspirators’ testimony: that the declarant was not a co-conspirator; that the party against whom the statement is offered was not a co-conspirator; that the statement was not made ‘in the course’ of the conspiracy; that the statement was not made ‘in furtherance of the conspiracy.” United States v. Burton, 126 F.3d 666, 673 (5th Cir. 1997) (addressing FRE 801(d)(2)(E)). All the record shows here is that Holmes objected—even, perhaps, moved to strike—based on hearsay. In response, the prosecution invoked the coconspirator exception to the hearsay rule. We do not know what Holmes argued to overcome the State’s invocation of NRS 51.035(3)(e), see 21 Federal Practice and Procedure, supra, § 5036.1, at 645 (“if in response to a hearsay objection, the opponent invokes a hearsay exception, the objector will probably have to explain to the judge why the exception does not apply in order to preserve the error for appeal” (interpreting FRE 103, the counterpart to NRS 47.040(l)(a))), nor as in Burton, 126 F.3d at 673, can we say whether Holmes objected that Reed’s statement to Richardson was not “in the course” or “in furtherance” of the conspiracy. And unless the argument made on appeal appears in the record below, this court lacks a satisfactory basis for assessing prejudicial error. See Fish v. State, 92 Nev. 272, 276, 549 P.2d *578 338, 340-41 (1976) (objection on the grounds that a coconspirator’s statements “were not made during the course or in furtherance of the conspiracy” was not adequately preserved by an objection to the adequacy of the proof of the conspiracy). Our review, therefore, is limited to plain error. Burton, 126 F.3d at 673-74; see Fish, 92 Nev. at 276, 549 P.2d at 341.
For error to be plain, the complained-of error must be “ ‘so unmistakable that it reveals itself by a casual inspection of the record.’ ” Saletta v. State, 127 Nev. 416, 421, 254 P.3d 111, 114 (2011) (quoting Patterson v. State, 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995)). Holmes argues that Reed’s statements to Richardson about the shooting could not have been made “during the course and in furtherance of the conspiracy” because, by the time he spoke to Richardson, the robbery was over and Nelson was dead. But Crew v. State, 100 Nev. 38, 46, 675 P2d 986, 991 (1984), holds that, under NRS 51.035(3)(e), “the duration of a conspiracy is not limited to the commission of the principal crime, but extends to affirmative acts of concealment.” Thus, in Crew, we upheld admission of statements by a coconspirator about plans to move buried bodies in case the party against whom the statements were admitted, who was being interviewed by the police at the time the statements were made, divulged the bodies’ location to the police. This was deemed “in furtherance of the conspiracy to commit the crime and to ‘get away with it.’ ” Id.; see 30B Michael H. Graham, Federal Practice and Procedure § 7025, at 289 (interim ed. 2011) (“Statements in furtherance of [a] conspiracy include statements made to . . . induce further participation, prompt further action, reassure members, allay concerns or fears, keep conspirators abreast of ongoing activities, [or] avoid detection,” though “mere conversations or narrative declarations of past events are not in furtherance of the conspiracy.”).
Richardson’s conversation with Reed occurred less than two hours after the murder and robbery, while police and ambulance crews were still at the crime scene. It appears that Reed was updating Richardson, on whom both Reed and Holmes relied for advice and help, on the situation—though it can also be argued (it was not, at least not on the record we have) that Reed’s remarks amounted to self-serving blame-shifting. We know that Reed and Holmes did not get the drugs and money they hoped for from Nelson and that Richardson gave Holmes money at the bus station so he could leave town hours after he talked to Reed. But with no record discussion of the “during the course and in furtherance of the conspiracy” requirements of NRS 51.035(3)(e) as they might apply to what Reed said to Richardson about the shooting, it is not *579 possible to say whether the conversation was to “keep conspirators abreast of ongoing activities [or] avoid detection” (admissible) or “mere conversations or narrative declarations of past events” (inadmissible). Assuming objection, argument, perhaps an offer of proof, a ruling could legitimately have gone either way. Given this record, an abuse of discretion amounting to plain error does not appear.[3]
m.
Holmes argues that the district court should have suppressed the unwarned statement he made' to the Nevada detectives who interviewed him at his California parole officer’s office. This argument fails under Howes v. Fields, 565 U.S. 499, 514-17 (2012), because the interrogation was not custodial, see also Minnesota v. Murphy, 465 U.S. 420, 431 (1984), and thus did not require a warning under Miranda v. Arizona, 384 U.S. 436 (1966). Also, the district court’s finding of voluntariness was correct. Rosky v. State, 121 Nev. 184, 190, 111 P.3d 690, 694 (2005).
Holmes’s remaining assignments of error also fail. The detectives testified about their investigation, not witness veracity, and as such, the district court had no reason to limit the scope of the testimony, Cordova v. State, 116 Nev. 664, 669-70, 6 P.3d 481, 484-85 (2000). Finally, the statements made in the prosecutor’s closing argument do not warrant reversal because, while improper, they did not substantially affect the jury’s verdict. Valdez v. State, 124 Nev. 1172, 1188-89, 196 P.3d 465, 476 (2008).
Accordingly, we affirm.
Hardesty, J., concurs.

 Clark identified Holmes in court as the shooter, stating that he got a clear look at him after he removed his ski mask and shot Nelson. Holmes initially challenged this eyewitness identification as suspect but abandoned the challenge in his reply brief based on Perry v. New Hampshire, 565 U.S. 228 (2012).

 The district court also deemed the lyrics admissible under the permissible, nonpropensity-purposes list in NRS 48.045(2), which provides that “[evidence of other crimes, wrongs or acts is not admissible to prove” bad character or criminal propensity but may be admitted “for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.” This was error. The State offered the lyrics to show that Holmes committed the charged crimes, not as evidence of other crimes, wrongs, or acts. See Greene v. Commonwealth, 197 S.W.3d 76, 87 (Ky. 2006). Also, if one or more of NRS 48.045(2)’s permissible, non-propensity purposes applied, the district court should have identified the purpose(s) in its ruling and the limiting instruction, rather than reflexively reciting the foil list of permissible purposes contained in NRS 48.045(2). Newman v. State, 129 Nev. 222, 231, 298 P.3d 1171, 1178 (2013).

 Holmes also argues that the admission of Reed’s statement to Richardson violated his rights under the Confrontation Clause. This argument fails, since coconspirator statements to one another or even to a governmental informant are “nontestimonial statements that fall[ ] outside the requirements of the Confrontation Clause.” United States v. Hargrove, 508 F.3d 445, 449 (7th Cir. 2007) (citing and discussing Crawford v. Washington, 541 U.S. 36 (2004), and Davis v. Washington, 547 U.S. 813 (2006)).