Filed 11/6/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>JERRY CONEAL,<br><br>　　　　Defendant and Appellant. | A152529<br><br>(San Mateo County<br>Super. Ct. No. SC080432A) |


　　　　Jerry Coneal appeals following his conviction for first degree murder (Pen. Code, § 187, subd. (a)).[1]  In the published portion of the opinion, we consider his challenge to the admission of five rap videos featuring appellant and/or members of appellant's gang. As we explain, the rap videos had minimal probative value, either because they were cumulative of other, less prejudicial evidence, or because their probative value depended on construing the lyrics as literal statements of fact or intent without a persuasive basis to do so.  This minimal probative value was substantially outweighed by the highly prejudicial nature of the violent, inflammatory lyrics, and the admission of these videos was therefore an abuse of discretion under Evidence Code section 352.  In light of the substantial other evidence of appellant's guilt, however, we find the error harmless.  In the unpublished portion of the opinion, we reject appellant's remaining contentions.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II–V.

[1] All undesignated section references are to the Penal Code.

BACKGROUND

*The Shooting*

At approximately 8:21 p.m. on October 5, 2012, police responded to reports of gunfire on a residential street in East Palo Alto. Police found Christopher Baker at the top of a driveway, breathing but unresponsive, with apparent gunshot wounds. A bicycle lying in the middle of the street was later identified as belonging to Baker. Baker died at the scene from multiple gunshot wounds.

On the other side of the street, a running but unoccupied silver Ford Escort was on the sidewalk, apparently stuck on a fence. The driver's door was open, the front passenger seat was steeply reclined, and the headlights were off. Appellant's blood was found in the Ford Escort and on the outside of a nearby parked car.

The Ford Escort was registered to Lakeisha Campbell. Campbell testified that she loaned the car to Miguel Rivera, her then-boyfriend and a friend of appellant's, at around 7 p.m. on October 5, 2012. A couple of hours later, Rivera called Campbell, told her the car had been stolen, and directed her to report the theft to the police. About 30 minutes later, Rivera arrived at their home, with blood on his stomach but no apparent injuries.

*Gang Evidence*[2]

Appellant and Rivera were members of the "Taliban" gang, whose territory extended through parts of East Menlo Park and East Palo Alto. The Taliban had a longstanding and violent rivalry with another East Palo Alto gang, "Da Vill." The People played rap videos made before the shooting depicting Taliban and Da Vill members taunting rivals and bragging about violence they had committed or intended to commit.

On September 30, 2012—less than a week before Baker was killed—two Taliban members were shot by a Da Vill member and a member of a gang allied with Da Vill. On October 5, a memorial for a murdered Da Vill member called "Box" was held around the corner from where Baker's body was found. Baker, a Da Vill member, attended the

---

[2] The gang evidence presented at trial is discussed in more detail *post,* part I.A.

2

memorial and was wearing a shirt memorializing Box when he was killed. On October 7—shortly after Baker was killed—a Da Vill member shot two Taliban members, one fatally.

*Appellant's Actions the Day of the Shooting*

On October 5, 2012, around 11 a.m., appellant "liked" a Facebook post expressing birthday wishes to Box, the deceased Da Vill gang member whose memorial would be held later that day.

Around noon, appellant sent a message on Facebook to a member of a gang allied with Da Vill, trying to identify a person who had been looking for appellant. The other gang member wrote, "Damn. Shit real serious?" Appellant replied, "Yup. It's gone get real too." The People's gang expert testified this indicated there would be a retaliation for what was perceived to be disrespectful conduct.

In the early afternoon, appellant sent messages on social media indicating that he was trying to buy firearms.

*Neighborhood Testimony and Crime Scene Evidence*

On the evening of the shooting, a resident of the block on which Baker was killed saw a car with two occupants pass in front of his house three times in less than ten minutes. The resident heard gunfire 10 to 15 minutes later and, when he went outside, saw what he thought was the same car crashed against a fence.

Other residents testified they heard gunshots that evening: most heard an initial grouping of shots, a pause, and then a second grouping. "ShotSpotter"—an acoustic gunfire detection and location system—recorded 15 shots at 8:20 p.m. around the location Baker was killed and then, after a break of about eight seconds, 19 additional shots a half-block away, near the location of Box's memorial.[3] Two residents, after hearing the shots, saw two people running away.

---

[3] ShotSpotter has a 25-meter margin of error.

Five cartridge casings were recovered from the street near the bicycle, and four more cartridge casings were found in the driveway where Baker lay. These cartridges were all fired from the same Glock semiautomatic firearm. In addition, two bullet fragments were removed from Baker's body and a third was removed from the garage door in the driveway where Baker died. These three bullet fragments—which came from three separate bullets—were fired from a second gun, a revolver. Based on this evidence, a firearms and ballistics expert opined there were at least two guns involved in the shooting resulting in Baker's death.

Sixteen additional casings were found at the corner of the block, near the location of Box's memorial, all of which came from the same Glock firearm. This firearm (not the same Glock that fired casings found near the bicycle and Baker's body) was used two days later when a Da Vill member shot two Taliban members. Multiple bullet fragments recovered from the Ford Escort exhibited characteristics typical of bullets fired from Glock firearms. The People's theory was these casings were from the second round of shots and were fired by Da Vill members attending Box's memorial who had heard the first round of shots.

A handgun was found under Baker's body. Although the gun was one bullet shy of being fully loaded, loading the last bullet into the gun was a cumbersome process that the prosecution argued Baker did not likely undertake. The gun was also corroded, making it difficult to operate. Baker had particles consistent with gunshot residue on his hands, which could have resulted from firing a gun, being in the vicinity of a gun when it was fired, or touching a surface with gunshot residue on it.

There was evidence that the crime scene could have been contaminated: the original crime scene tape did not cover the entire crime scene; the responding officer had run to the driveway where Baker lay, possibly disturbing casings or fragments; and the morning after the shooting, officers found the crime scene tape was down, allowing people to move through the crime scene.

*Appellant's Actions After the Shooting*

Warner Travis, a friend of appellant's and fellow Taliban member, testified pursuant to a plea agreement in a separate murder case that guaranteed him a sentence of 25 years to life in exchange for his truthful testimony. Appellant told Travis that he and Rivera went to the neighborhood where the crime took place during a gathering for Box, intending to "shoot somebody." While there, appellant shot the victim "off his bike" and in the face,[4] Rivera also fired shots, and then they tried to drive off but crashed. Appellant told Travis he was worried because he had been injured and might have left blood in the car. Travis thought Anthony Fuller was probably there when appellant said he shot Baker, but Fuller testified that he never heard any such statements.

Appellant appeared in a rap video titled "On Da Boulevard," in which he rapped, "I don't know who baked the last cake,/All I know was the place got yellow taped." Although the video was first posted to YouTube a few weeks after Baker's death and the prosecutor argued the quoted lyrics referred to his killing, it was unclear whether appellant's lyrics were recorded before Baker was shot (see further discussion *post,* part II).

In November 2012, appellant, while in jail, was recorded on a phone call reciting lyrics from a new rap song he had written called "Jailhouse Gas."[5] The lyrics referred to catching someone "slippin for the mob[6] he got sprayed up. . ./And I got so close in, like I was going for a lay up"; "Two shooters on one hit that's how I like to move"; "nine tore his chest out . . . had that boy stretched out. Got his partners mad and left his fams stressed out"; "Caught him in the driveway, and chased him up to the porch."

---

[4] Autopsy photographs show that Baker was not shot in the face.

[5] An audio recording of the call was played for the jury and a transcript was provided.

[6] "Village Mob" is another name for the Da Vill gang.

Appellant was interviewed by police in July 2013 and again in November.[7] Appellant denied knowing anything about a Ford Escort with his blood in it or hanging out with Rivera.

*Appellant's Testimony*

Appellant testified in his own defense at trial. He was a member of the Taliban. On October 5, 2012, Rivera, a fellow Taliban member, drove with appellant to the street where Baker was killed because Rivera "wanted to go drop or get some money from his girlfriend's little sister." Appellant did not know they would be near a memorial gathering for Box, who had been friends with appellant and was not in Da Vill. Appellant also did not initially know that Rivera had a gun.

They did not circle the block. Instead, Rivera said something about not remembering the house and got out of the car. Appellant, who had been smoking marijuana all day, remained in the car, leaning back in his seat. Appellant saw a guy ride by on a bicycle and then heard shots. Appellant ducked as the shooting continued and, when it stopped, he looked back and saw Rivera running to the car with a gun in his hands. As soon as Rivera got in the car, more shots were fired, hitting the car. Appellant's thumb was injured either from a bullet or broken glass. Rivera tried to drive but backed the car into a fence and got stuck, so they got out of the car and ran.

Although Taliban and Da Vill were rival gangs, being a Taliban member did not mean that appellant wanted to kill Da Vill members. Appellant tried to buy a gun on the day Baker was killed because he thinks guns are cool, but he was not able to buy a gun that day. Appellant told Travis that he was there when Baker was killed, but he did not tell Travis he had shot Baker. Appellant lied to police in the interviews because he "didn't want to get [Rivera] in trouble" and did not want to inadvertently cast suspicion on himself.

---

[7] Video recordings of the interviews were played for the jury and transcripts were provided.

Appellant had been rapping since he was around 11 years old. He rapped about violence and the gang lifestyle to make himself "look like a gangster" so he could get "ladies" and hopefully become a famous rapper. Only some of the things he rapped about related to reality. He writes "about stuff I don't do all the time." For example, although he admitted the lyrics to Jailhouse Gas were about Baker's murder, he "just took what somebody told me and put it in my rap." Rapping about killing Baker was different than being "out on the streets claiming I did that." He wrote the lyrics in On Da Boulevard before Baker was killed.

*Verdict and Sentence*

The jury convicted appellant of first-degree murder (§ 187, subd. (a)) and found true allegations that appellant committed the crime by means of lying in wait and to further the activities of his criminal street gang (§ 190.2, subd. (a)(15) & (22)); committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)); personally discharged a firearm causing death (§ 12022.53, subd. (d)); and committed the crime for the benefit of a criminal street gang and a principal in the crime personally discharged a firearm causing death (§ 12022.53, subd. (e)). The trial court sentenced appellant to life in prison without the possibility of parole, with a consecutive term of 25 years to life and a second consecutive term of 25 years to life stayed pursuant to section 654.

## DISCUSSION

I. *Gang Evidence*

Appellant argues the trial court's admission of gang evidence was an abuse of discretion under Evidence Code section 352. He argues that the "sheer volume" of the gang evidence was excessive and, in particular, he targets the admission of several rap videos published before the shooting that feature appellant and/or other Taliban members.

A. *Additional Background*

1. *Detective Soares*

7

Menlo Park Police Detective Ed Soares testified as an expert on criminal street gangs in East Palo Alto and Menlo Park.[8] Soares identified Taliban clothing, hand signs, and sayings; for example, the expression " 'anybody can get it,' " which was used by the Taliban to "instill[] a fear that anybody within the community, even their own gang members, can get assaulted, killed." Soares identified more than a dozen individuals as Taliban members, based on his personal observations of them associating with known Taliban members, displaying Taliban hand signs, wearing Taliban colors, and/or having Taliban tattoos.

Soares had investigated Taliban members for crimes including armed robbery, assault with a deadly weapon, attempted murder, murder, and narcotics sales. In 2008, Soares personally witnessed a Taliban member shooting at a car associated with the Da Vill gang. Soares testified that in the East Palo Alto gang subculture, "if you have a gang and one of your members gets killed and it's by another gang . . . , you are expected to retaliate."

In November 2012, Soares contacted appellant at a Taliban hangout. Appellant had "Stone" tattooed on one forearm and "Nation" tattooed on the other, a reference to Stoney Gipson, an older and respected Taliban member who had been killed. Soares also testified about a photograph he found in March 2013 on a Taliban member's phone depicting appellant flashing a Taliban hand sign and associating with two Taliban members.

### 2. *Inspector Draper*

---

[8] Before Soares testified, and again before deliberations, the jury was instructed that it could consider "evidence of gang activity" only in determining (1) appellant's intent, purpose, and knowledge as required for the gang-related crime, enhancements, special circumstances allegations, (2) appellant's motive, (3) whether the Taliban is a criminal street gang, (4) to evaluate the credibility or believability of a witness, and (5) in considering the facts and information relied upon by an expert witness in reaching his or her opinion. Although the People's brief on appeal argues gang evidence was also admissible to prove identity and modus operandi, the evidence was not admitted for these purposes below.

San Mateo County District Attorney's Office Inspector Jamie Draper also testified as an expert on criminal street gangs, specifically the Taliban and Da Vill gangs.

In 2012, there were approximately 20 active Taliban members. Draper opined that numerous individuals, including appellant, were members of the Taliban, based on tattoos he observed in person or in certified copies of booking photographs; prior criminal convictions; photographs found on social media records showing the individual displaying Taliban hand signs, Taliban symbols, references to incarcerated or killed Taliban members, and/or associating with known Taliban members; and/or the individual's rap lyrics and appearance in rap videos. Draper testified that Gipson was "a very, very respected member of the [Taliban] gang" who was "looked at as essentially a leader."

Draper testified about predicate crimes committed by various gang members, including assault with a firearm, grand theft from a person, possession of a firearm by a gang member, possession of a firearm by a felon, felony possession of marijuana for sale, carrying a concealed firearm, and felony possession of methamphetamine for sale.[9] Taliban members often make or display references to members who are in custody, giving other members knowledge of the crimes committed by the gang.

Draper testified that the rivalry between Taliban and Da Vill was a violent one. In this rivalry, and in gang culture generally, "if one of your members is killed by a rival gang, retaliation is expected." Draper testified about the respective territories claimed by the Taliban and Da Vill gangs. A gang member entering a rival gang's territory could be shot and/or killed. There was evidence that the neighborhood where Baker was killed, called "the Gardens" or "the G," was Da Vill territory, but also evidence that the area was neutral in the Taliban/Da Vill rivalry.

---

[9] The alleged gang enhancement required proof of " 'gang members' individual or collective "commission . . . of two or more" enumerated "predicate offenses" during a statutorily defined time period.' " (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 581.)

Gang members used social media to stake out their gang's claim to territory. For example, a photograph posted on Rivera's social media account depicted a large group of people standing in front of a street sign in Taliban territory. Appellant was in this photograph, making a hand gesture mimicking holding a firearm.

### 3. *Rap Videos*[10]

Draper testified that rap music was used by Taliban and Da Vill members as "a back-and-forth bragging . . . between the gangs, insulting the rival gangs, bragging about the crimes that they have done . . . ." Gang members rap about "real-life events," including "real-life individuals who have been murdered." On cross-examination, Draper testified that rap lyrics can also describe made up or inflated events and that appellant, like some other rappers, was motivated by a desire to make money from rap music. Warner Travis, the Taliban member, testified that his lyrics in one of the rap videos played for the jury—such as, "I'm aiming [a gun] at your head"—described acts he had not actually done.

Draper testified at length about each of the videos, interpreting the lyrics and testifying about numerous exhibits that were screenshots of the videos.[11] "The Hoodstarz & YF - Definition Music Video" was uploaded to YouTube in August 2011. Appellant does not appear or sing in the video, which instead features other Taliban members. Several screenshots from the video showed various Taliban members displaying Taliban symbols, a firearm, and/or hand gestures mimicking the holding of a firearm.

Draper interpreted several of the song's lyrics. The first verse was rapped by Gipson. "You don't know the drama I seen, your block rowdy but you don't want the

_____

[10] During in limine motions, appellant sought to exclude or limit as unduly prejudicial the presentation of rap videos featuring appellant and/or other Taliban members. The trial court excluded two videos; the People withdrew their request to play two additional videos; and the trial court denied the motion as to the remaining videos. Appellant renewed his objection each time a Taliban rap video was played for the jury.

[11] All of the videos were played for the jury and a transcript was provided. We quote the lyrics as represented in the transcripts.

10

drama I bring.  I bring beef to the Whitehouse death to your front door" was about boasting, "calling out" rivals, and threatening violent repercussions.  "[M]urder scenes shit you only seen in the movies" was about promoting violence.  A line about youths "lurkin looking for a new stripe" referred to the expectation that younger gang members commit crimes for the gang to earn respect.  The next line—"Showed em how to move mean, took em on a few hikes"—referred to showing younger gang members how to commit violence.  A line about "rid[ing]" with others who have "a few strikes and a few lifes under their belt" was bragging about hanging out with people who commit violent crimes.

The chorus includes the line, "[I]f it's a beef he aint worried, slide back and bang em with the thirty."  Draper testified this line referred to not being worried about rivalries, going to back to their gang's territory, and shooting with "a 30-round magazine and extended clip for a firearm."  The next verse, performed by another Taliban member, refers to "[s]lap[ping]" someone "with a thirty dick," which means shooting them with an extended magazine.  "For Jeez I'm a drop shells" refers to committing a retaliatory shooting for a deceased Taliban member known as "Jeez."  Gipson raps the last verse, which includes the line, "you can get it in the face, you can get it in broad day, night or the morning.  It's on sight when I see e'm," referring to shooting a rival in the face anytime they are seen.  "This is my only warnin, when bullets start stormin and bodies all laid out" is bragging about the Taliban's violence and warning rivals.  "Cemetery under my belt no cases" refers to committing murders and not getting caught.

"Wayne - Really in Da Hood" was uploaded to YouTube in May 2012.  Appellant does not rap in this video, which was shot in Da Vill territory with the participants flashing Taliban hand signs to show disrespect for Da Vill.  Draper testified that the line, "Caught his ass slippin left him stankin at a street light" referred to catching a rival who had let his guard down.  The rap also referred to appellant by his nickname, saying "Boo Banga" will "handle that," while the rapper made a firearm motion.  The People again showed several screenshots from the video showing Taliban members flashing Taliban hand signs and displaying memorials to killed Taliban members.

11

"Boo Banga FT [featuring] Wayne Choosin-Clappin" was uploaded to YouTube in November 2011. Appellant rapped in this video with Taliban member Dwayne Henry. "Clappin" means shooting a gun. Draper testified that, in a line rapped by appellant, "Always been a shooter/Better yet damn clapper/I'm a beast when I creep/But . . . keep that heat," "clapper" means shooter and "heat" refers to firearms. When appellant raps, "Thang on my hip," "thang" means firearm. Appellant's next line, "Slide down your block with broom/Back and forth tryin to sweep" refers to moving a semiautomatic rifle back and forth while firing rounds. When Henry raps, "Now Boo's on the block/Creepin with a chop," "chop" is slang for an assault rifle. Henry raps, "So I stay with a torch" and "I'm ridin with a hammer"; both "torch" and "hammer" are slang for firearm. When Henry raps, "You ain't good in the hood/. . . I'll Taliban ya," he means "if you are not supposed to be in our hood, . . . [w]e'll get you, basically." The People showed several screenshots from the video depicting appellant making Taliban hand signs and mimicking holding a firearm, other Taliban members making Taliban hand signs, and images of guns.

"Felonies" was uploaded to YouTube in July 2012.[12] In the video, appellant raps the following chorus multiple times: "Assault with a Deadly Weapon, Strong arm robbery, Possession and Sales, Grand Theft, and Stolen Property, Arson, Ammunition, Home Invasion and Burglary, Firearms, Manslaughter, Murder, all First Degree." Draper opined that the chorus is an expression of the Taliban's primary activities and puts Taliban members on notice as to the gang's primary activities. Appellant raps, "Slide through the back," referring to stealthily entering a rival gang's territory. The People presented several screenshots showing appellant making Taliban hand signs and associating with other Taliban members.

---

[12] The video was played during Warner Travis's testimony and the trial court sustained appellant's objection to playing it again during Inspector Draper's testimony; however, Draper testified about the lyrics and several screenshots from the video.

12

"Free Wayne Choosin, Yellow Tape Gang, RIP Man-Man" was uploaded to YouTube in April 2012. The People showed several screenshots from the video depicting appellant making Taliban hand signs or mimicking holding a firearm, and other Taliban members doing the same. Draper testified that in appellant's rap, "The .357 send you to Heaven for God sakes./Last man slid through put him on a shirt./Caught him slippin trying to lurk messed around and got merked./Leave a whole family six feet in the dirt," ".357" refers to a type of firearm, "put him on a shirt" refers to the gang practice of wearing shirts honoring killed members, and "merked" means murdered.

The final rap video played by the People, "On Da Boulevard - Boo Banga," and the audio recording of appellant's "Jailhouse Gas" rap are not challenged by appellant on appeal. The People also showed two rap videos by Da Vill members; appellant did not object to their admission below or on appeal.

B. *"Sheer Volume"*

Appellant concedes that "some" gang evidence was admissible. He could hardly argue otherwise. The People's theory was that appellant was a gang member who killed the victim because he was a rival gang member; the People also alleged a gang enhancement and a gang special circumstance. Thus, even the bare minimum of gang evidence necessary for the People's case would likely be substantial.

Nonetheless, appellant asserts that "[m]uch" of the challenged gang evidence was cumulative and had an "overwhelmingly" prejudicial effect. With the exception of five of the rap videos (discussed separately below), appellant does not identify any specific evidence as either cumulative or excessively prejudicial. Instead, appellant points to the "sheer volume" of the gang evidence: almost 400 pages of testimony by the two gang experts, 140 photographs of gang members, and multiple gangster rap videos.

Absent an analysis of specific evidence, reference to volume alone is meaningless. For example, while appellant emphasizes the length of the gang expert testimony, nearly half of this testimony—around 170 pages out of 400—was elicited on cross-examination. As for the 140 photographs of gang members identified by appellant, about a dozen depicted Da Vill or other non-Taliban gang members.

13

To be sure, some of the more than 200 pages of expert testimony elicited by the prosecution and more than 100 photographs of Taliban members were cumulative. For example, both gang experts testified about the gang membership of several of the same individuals. And more than 30 photos were screen shots from the Taliban rap videos played for the jury. But appellant fails to explain how he was prejudiced by this cumulative evidence. Nor has he shown he preserved objections to all of the evidence challenged in this sweeping argument.

Appellant's reliance on *People v. Albarran* (2007) 149 Cal.App.4th 214, in which the Court of Appeal found the admission of certain gang evidence unduly prejudicial, is unavailing. Although the court noted that the gang expert's testimony "consumed the better part of an entire trial day (in a six day trial) and spans 70 pages of the reporters' transcript" (*id.* at p. 228, fn. 10), its analysis did not rest on the length of the gang expert's testimony alone. Instead, the court discussed specific evidence—the identification of the defendant's fellow gang members, evidence of "the wide variety of crimes they had committed," "a specific threat [the defendant's gang] had made in their graffiti to kill police officers," and "references to the Mexican Mafia"—which was all "irrelevant to the underlying charges and obviously prejudicial." (*Id.* at pp. 227–228.) Appellant has provided no such analysis here (other than as to the rap videos, discussed below), and *Albarran* provides no authority that the quantity of evidence alone renders its admission error. Accordingly, appellant's claim that the sheer volume of gang evidence was unduly prejudicial fails.

C. *Rap Videos*

1. *Legal Background*

"Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]' [Citations.] . . . Even if gang evidence is relevant, it may have a highly inflammatory impact on the

jury.  Thus, 'trial courts should carefully scrutinize such evidence before admitting it.' "
(*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)  "A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion."  (*Id.* at p. 193.)

Two published California cases have considered the admissibility of rap lyrics.  In *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*), gang graffiti written by one of the defendants was crossed out and replaced with another gang's logo.  (*Id.* at p. 1366.)  When the two defendants went looking for the culprit, the victim yelled out the name of the other gang; one of the defendants punched him and the other shot him.  (*Id.* at pp. 1366–1367.)  On appeal, the defendants challenged the admission of written rap lyrics found in a search of one of their homes.  (*Id.* at p. 1372.)  After concluding the lyrics were "adequately authenticated as the work of" this defendant, the Court of Appeal found the admission proper: "they demonstrated his membership in [his gang], his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing."  (*Id.* at p. 1373.)  Because the "crime [was] alleged to be gang related[,] [g]ang membership was obviously important, and evidence tending to show it was highly relevant."  (*Ibid.*)  Although the lyrics contained "general threats of violence," "[t]he mere fact the lyrics might be interpreted as reflective of a generally violent attitude could not be said 'substantially' to outweigh their considerable probative value."  (*Ibid.*)

In *People v. Zepeda* (2008) 167 Cal.App.4th 25 (*Zepeda*), the defendant shot a rival gang member and his son.  (*Id.* at p. 28.)  At trial, the jury heard two tracks from a gangster rap CD that the defendant had written.  (*Id.* at p. 32.)  The Court of Appeal found no abuse of discretion: "The evidence was probative of defendant's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it. The songs showed that defendant's gang had the motive and intent to kill [members of the rival gang]. . . . [¶] While lyrics and poems do not often establish their author's true state of mind [citation], the gang expert here testified that gangs communicate through music.  Defendant's communications here were not ambiguous or equivocal.  These lyrics, coupled with the other evidence of defendant's gang membership and his animosity towards [members of the rival gang], go beyond mere fiction to disclosing

15

defendant's state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities," and "provided noncumulative evidence of defendant's state of mind and his gang association, differing in context from his tattoos, drawings, notebooks, and pictures of himself flashing gang signs." (*Id.* at p. 35.) The court further found the tracks were not "unduly prejudicial. . . . The language and substance of the lyrics, although graphic, did not rise to the level of evoking an emotional bias against the defendant as an individual apart from what the facts proved." (*Ibid.*)

### 2. *Analysis*

Appellant argues the admission of the five Taliban rap videos published to YouTube before Baker's murder was an abuse of discretion under Evidence Code section 352.[13] As we explain below, we agree with this contention.[14]

### a. *Cumulative Evidence*

Appellant does not dispute that the rap videos were relevant. However, he argues that the videos were cumulative to other evidence. With respect to a number of the purposes for the rap videos advanced by the People, we agree. Significantly, as noted above, for each of the rap videos the People also presented, as separate exhibits, multiple screenshots capturing images from the videos.[15] For many of the purposes advanced by the People, the probative value of the videos was completely or largely captured by the screenshots. In addition, substantial other evidence was presented in the People's case-in-chief.

---

[13] Although appellant's briefs refer to six Taliban rap videos published before Baker's murder, we agree with the People that the record reveals only five such videos.

[14] Because of this conclusion, we need not decide appellant's argument that the rap lyrics sung by Taliban members other than appellant were inadmissible hearsay.

[15] We understand appellant's challenge to be limited to the videos and the accompanying transcripts, not to the separate screenshot exhibits. His argument on appeal focuses on the prejudicial impact of the lyrics. And his in limine motion below argued the probative value of some videos could be shown through still images.

For example, the People argued the rap videos were evidence of appellant's gang membership. The People presented more than a dozen screenshots from the videos depicting appellant associating with other Taliban members and making Taliban hand signs. Indeed, the People argue that the probative value of the videos on this point was their depiction of appellant "making characteristic gang gestures and collaborating with other Taliban members"—a depiction equally established by the screenshots. The People presented an additional dozen or so photographs—from Taliban social media records and a Taliban member's phone—showing appellant associating with Taliban members, wearing Taliban clothing, and/or displaying Taliban hand signs. Appellant has a tattoo referring to the respected Taliban leader Stoney Gipson. Detective Soares contacted appellant while appellant was associating with Taliban members at a known Taliban hang-out. Warner Travis testified appellant was a Taliban member and identified him in two photographs displaying Taliban hand signs. In light of this substantial evidence of appellant's gang membership, including numerous screenshots from the rap videos, the additional probative value of the videos themselves was minimal.

The People also argued the videos were evidence of the gang membership of Dwayne Henry, Wilbert Ard, Vernon Durham, and Anthony Green, each of whom had committed predicate offenses. As to each of these individuals, the People presented multiple screenshots from the rap videos that showed them associating with other Taliban members, flashing Taliban hand signs, wearing Taliban clothing, and/or displaying Taliban tattoos. The People also presented multiple other photographs—found on Taliban members' social media accounts or in certified booking records—depicting these individuals with Taliban tattoos, associating with Taliban members, and/or wearing Taliban clothing. Detective Soares testified he had personally observed Henry and Ard associating with other Taliban members, wearing Taliban colors, and/or displaying Taliban hand signs. Henry had admitted a felony he committed was for the benefit of a criminal street gang, and Durham had been convicted of being a gang member in possession of a firearm. Again, in light of this other evidence, the additional probative value of the videos themselves was minimal.

17

The People argued the "Definition" video was probative of Stoney Gipson's status as "the figurehead of the Taliban," which was necessary to explain the significance of appellant's "Stone Nation" tattoo. The probative value of the video, as argued by the People, is that Gipson "is one of the most prominent rappers." We query the strength of this probative value in light of other videos in which other Taliban members are prominent; for example, while Gipson appears in the "Really In Da Hood" video, Henry is the prominent rapper. In any event, there was other, substantially more probative, evidence of Gipson's status in the Taliban, to wit, both experts testified that Gipson was a respected Taliban member and Draper testified he was "looked at as essentially a leader" of the gang.

Finally, the People argued the rap videos demonstrated the rivalry between the Taliban and Da Vill gangs. Again, there was a substantial amount of other evidence demonstrating this rivalry. Draper testified there was a violent rivalry between the two gangs. Soares personally observed a Taliban member shooting at a car associated with the Da Vill gang. Shortly before Baker's killing, Da Vill members shot Taliban members; the People argued Baker's killing was in retaliation for this shooting. Shortly after Baker's killing, Da Vill members again shot Taliban members, this time killing one. And the People introduced screenshots from one of the videos depicting Taliban members making Taliban hand signs in front of a park at the heart of Da Vill territory, in what Draper testified was an act of disrespect.

We note that in neither *Olguin* or *Zepeda* were the raps so cumulative for the purposes sought. Neither case involved videos, so no screenshots were used or available. (*Olguin, supra,* 31 Cal.App.4th at p. 1372 [handwritten rap lyrics]; *Zepeda, supra,* 167 Cal.App.4th at p. 32 [rap audio CD].) In *Olguin*, there is no indication of substantial other evidence of the defendant's gang membership. (*Olguin,* at p. 1373.) In *Zepeda,* although there was other evidence of the defendant's gang membership, the quantity of such other evidence—writings with gang symbols found in the defendant's residence, one photograph showing the defendant making a gang sign, and gang tattoos (*Zepeda,* at p. 32)—was not as substantial as that presented here.

18

In sum, there was a substantial amount of other probative evidence as to several purposes for which the People introduced the rap videos. This other evidence, including screenshots from the videos, rendered the additional probative value of the videos for these purposes minimal. In fact, the only new "information" provided by the videos is the lyrics, and the lyrics are the problem. As we will explain, the lyrics add no probative value but are extremely prejudicial.

b. *Literal Treatment of Rap Lyrics*

The People's arguments about the probative value of the lyrics rely on construing them literally, as statements of fact or actual intent. For example, the People argued that appellant's rap enumerating a list of felony crimes was evidence of "the Taliban gang's primary criminal activity." The People also argued appellant's raps about killing rival gang members, catching his victims by surprise, and employing drive-by shootings were evidence of appellant's actual strategies and intent. And they relied on lyrics describing or advocating violence as evidence that the rapper in fact committed and/or advocated such acts.

The People suggest that "statements framed as rap lyrics" are indistinguishable from statements made in other contexts. Our Supreme Court has held to the contrary. "In general, '[r]easonable persons understand musical lyrics and poetic conventions as the figurative expressions which they are,' which means they 'are not intended to be and should not be read literally on their face, nor judged by a standard of prose oratory.' " (*In re George T.* (2004) 33 Cal.4th 620, 636–637.) As the Supreme Court reasoned with respect to rap lyrics in which the author claimed to have committed a murder, "it appears the words were *merely rap lyrics*. No reason appears to assume they relate actual events. . . . [I]f, hypothetically, a piece of paper were found in Don McLean's home containing the handwritten words, 'Drove my Chevy to the levee but the levee was dry,' that would not mean that McLean personally drove a Chevrolet to a levee and discovered it lacked water." (*People v. Melendez* (2016) 2 Cal.5th 1, 24 (italics added).)

To be sure, Inspector Draper testified that gang members rap about "real-life events." But he also conceded that rap lyrics can describe made up or inflated events.

19

Draper did not purport to be able to distinguish between the two, apart from obviously fictional lyrics like Gipson's rap that he brought "beef to the Whitehouse" and appellant's rap that he left "a whole family six feet in the dirt." Absent some meaningful method to determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal. (See *In re George T., supra,* 33 Cal.4th at pp. 636–637; *People v. Melendez, supra,* 2 Cal.5th at p. 24; *State v. Skinner* (N.J. 2014) 95 A.3d 236, 251 [where "there was no evidence that the crimes and bad acts about which defendant wrote in rap form were crimes or bad acts that he in fact had committed . . . [, t]he lyrics can only be regarded as fictional accounts"].)[16]

We do not mean to suggest that lyrics are never probative of their literal truth. For example, where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased.[17] (See *Holmes v. State* (Nev. 2013)

---

[16] We note the apparent discrepancy between the use of rap lyrics and the use of lyrics from other musical genres. " '[C]ourts do not treat lyricists of other mainstream musical genres similarly, even those who live an outlaw lifestyle or promote an outlaw image . . . are not presumed to be making statements about their beliefs, intent or their conduct. . . . We discern no reason why rap music lyrics, unlike any other musical form, should be singled out and viewed sui generis as literal statements of fact or intent." (*Commonwealth v. Gray* (Mass. 2012) 978 N.E.2d 543, 561; see also Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence* (2007) 31 Col. J.L. & Arts 1, 2–3, fn. 6 ["To date, research has identified only one case involving defendant-authored music lyrics admitted into evidence that did not appear to be rap music."].) One scholar has argued conventions specific to rap music render its lyrics particularly unreliable as literal evidence, including the use of "collective experiences" such that "[r]ap music lyrics may be based on the life of the lyricist, the lives of individuals he knows, or the lives of individuals he has observed"; the use of " '[e]xaggerated and invented boasts of criminal acts' " as part of " 'verbal duels' "; and the adoption of "mythical or real-life characters as alter egos or fictional personas." (Dennis, at pp. 20–23.)

[17] Because appellant does not challenge the admissibility of On Da Boulevard and Jailhouse Gas, we need not decide whether these raps bore a sufficient level of similarity

20

306 P.3d 415, 420 [admission of rap lyrics affirmed where there were "similarities between the lyrics and the facts of the charged robbery, as established by the evidence" and lyrics were written "after [the defendant's] arrest" for the charged crime]; *Greene v. Com.* (Ky. 2006) 197 S.W.3d 76, 86 [admission of rap video affirmed where it was "shot days after the murder" and showed the defendant "boasting of his crime"].)  It may also be that lyrics with sufficient corroboration from other evidence will have increased probative value.  (See *Zepeda, supra,* 167 Cal.App.4th at p. 35 ["These lyrics, *coupled with the other evidence of defendant's gang membership and his animosity towards Sureños,* go beyond mere fiction to disclosing defendant's state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities." (italics added)].)  However, corroborating evidence may also render the lyrics cumulative.

We do not purport to provide an exhaustive list of factors that may increase the probative value of lyrics as statements of literal fact or intent.  It is sufficient that no such factors were present here to increase the probative value of the rap lyrics as evidence that the Taliban's primary activities were the list of felonies rapped by appellant;[18] that appellant had or intended to kill rival gang members, catch victims by surprise, and engage in drive-by shootings; or that the Taliban rappers committed or intended to commit the various heinous crimes they rapped about.

### c. *Prejudicial Impact*

We now turn to the potential for prejudice from the rap videos.  The lyrics casually describe graphic, widespread violence.  For example, appellant's raps include: "Creep up when you sleepin/Leave you dead in your sheet"; "A thirty on that Mac 10 and it make you do a back flip./. . . So we left 'em bloody like a raw steak"; "Last man slid through

---

to the charged crime such that the increased probative value outweighed the potential for prejudice.

[18] We note that the predicate offenses proven by the People—assault, theft, firearms possession offenses, and drug offenses—did not include several felonies listed in appellant's rap, including arson, manslaughter, and murder.

21

put him on a shirt./ . . . Leave a whole family six feet in the dirt"; "I kill you and your kin folks"; and "I got a gun named 'Chap Stick.'/Boy she really clap shit./Slip up on that man and left his thoughts where his lap is."  His Taliban associates similarly rap: "I'm a let that snitch bleed from his head to his knees"; "Bullets in his head./Eyes still open but his body is still tweakin."; "you can get it in the face, you can get it in broad day, night or the morning.  It's on sight when I see e'm.  This is my only warnin, when bullets start stormin and bodies all laid out. . . . Spray e'm out a hundred shots . . . Rearrange your face, hands like a surgeon.  It's hurtin.  Bury e'm closed caskets.  Turn wife's into widows and sons to little bastards"; "I'll leave you in the traffic/Leave you stankin in the alley/In a dumpster where the cats is"; "Call me major pain cuz I'm a shoot until my wrist hurt"; and "Fill em up with hollow tips."

The rap videos also contain misogynistic lyrics.  Appellant rapped: "Bitches get played just like the radio station./Had a bitch named (UI) real dick pleaser./Sucked me so long until my dick had a seizure./But enough of all that cuz I aint worried about the cat./I treat 'em like change and just throw them on the track", a reference to pimping out women, according to Draper's testimony.  Other Taliban members rapped: "my bullets bisexual/I knock a bitch down/If she get disrespectful"; "Put a couple bitches on the track if they dumb enough"; "Never trust hoes"; and "Never love a bitch I be all in her purse."

Even with the testimony—from Inspector Draper, Warner Travis, and appellant himself—that not all lyrics describe actual events, the rap videos paint a picture of appellant and his fellow gang members as eagerly and ruthlessly seeking out and engaging in violence, with no empathy for their victims.[19]  While it may be that this picture is accurate, it poses a significant danger that the jury will use it as evidence of appellant's violent character and criminal propensity in violation of Evidence Code section 1101, subdivision (a).  (See *People v. Carter* (2003) 30 Cal.4th 1166, 1194

---

[19] The People argue the violence of the charged crime reduced the prejudicial impact of the videos.  While the charged crime was extremely violent, it alone does not convey the widespread bloodthirst conveyed by the videos.

(*Carter*) ["evidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged"]; *U.S. v. Gamory* (11th Cir. 2011) 635 F.3d 480, 493 ["[T]he substance of the rap video was heavily prejudicial. The lyrics presented a substantial danger of unfair prejudice because they contained violence, profanity, sex, promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle."]; *State v. Skinner, supra,* 95 A.3d at p. 251 ["defendant's graphically violent rap lyrics could be fairly viewed as demonstrative of a propensity toward committing, or at the very least glorifying, violence and death"].) Indeed, some of the purposes advanced by the People—the rap videos prove appellant "embraced the gang lifestyle" and was "a violent Taliban soldier"—skirt dangerously close to advocating the use of the videos as evidence of appellant's violent character. Similarly, a Taliban member's rap to "[c]all Boo Banga" who will "handle that," which the People urged below and on appeal was probative, seems to be nothing other than evidence of appellant's character for violence. And the misogynistic lyrics had no probative value yet were highly inflammatory. (See *Boyd v. City and County of San Francisco* (9th Cir. 2009) 576 F.3d 938, 949 ["[T]he court neglected to exclude the portions of the lyrics that . . . referenced and advocated prostitution. Failure to exclude these lyrics was error, as they had no probative value . . . and were unfairly prejudicial in light of their offensive nature." (fn. omitted)].)

### d. *Conclusion*

Our Supreme Court recently reiterated its advisement that "gang-related evidence 'creates a risk the jury will improperly infer the defendant has a criminal disposition' and that such evidence should therefore 'be carefully scrutinized by trial courts.' " (*People v. Mendez* (2019) 7 Cal.5th 680, 691.) This caution applies with particular force to rap songs that promote and glorify violence. Trial courts should carefully consider whether the potential for prejudice posed by these songs outweighs their probative value. In particular, where the rap lyrics are cumulative of other evidence, like screenshots, or where the probative value rests on construing the lyrics literally without a persuasive

basis to do so, the probative value will often be "substantially outweighed by [the] prejudicial effect."[20]  (*Carter, supra,* 30 Cal.4th at p. 1194.)

This was such a case.  The probative value of the videos and lyrics was minimal in light of the substantial amount of other evidence and the absence of a persuasive basis to construe specific lyrics literally.  Weighing this minimal probative value against the significant prejudicial effect, we conclude the admission of the rap videos was an abuse of discretion under Evidence Code section 352.

### 3. *Harmless Error*

Appellant contends the erroneous admission of the rap videos should be reviewed for harmlessness under the federal constitutional standard.  We disagree.  "The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair.  [Citation.]  'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial."  [Citation.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' "  (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817.)  There were multiple permissible inferences to be drawn from the evidence, most obviously, that appellant and others were Taliban members.  No due process violation occurred, and we will review the error under the state law harmlessness standard.  (*People v. Watson* (2008) 43 Cal.4th 652, 686 [" 'Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional [state law] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error.' "].)

The evidence incriminating appellant was strong.  He admitted being a member of the Taliban and the gang's violent rivalry with Da Vill was well-established by evidence

---

[20] Trial courts have the discretion to exclude a rap video but permit the People to introduce screenshots, even if the People have not separately sought to introduce the screenshots.

other than the erroneously-admitted rap videos.  Appellant admitted trying to buy a gun on the day of Baker's killing.  Most significantly, appellant admitted being at the scene of the shooting but claimed only Rivera had a gun, yet the ballistics evidence showed two guns were used against Baker.  Appellant's testimony was flatly contradicted by the ballistics evidence and there is no evidence—in appellant's testimony or otherwise—of a third person who could have shot at Baker.  The only other theory argued by appellant on appeal is that the jury could have concluded he acted in imperfect self-defense or in the heat of passion, based on evidence that Baker may have fired one shot.  But appellant's own testimony was to the contrary, and the presence of Baker's bike lying in the middle of the street strongly suggests Baker was not the instigator.  Accordingly, we find no reasonable probability that, but for the erroneous admission of the five Taliban rap videos, appellant would have received a more favorable outcome.[21]

## II.  *Closing Argument*

Appellant raises two claims of prosecutorial misconduct based on comments made in the prosecutor's closing statements.  We reject both claims.

### A.  *On Da Boulevard Comment*

#### 1.  *Additional Background*

During the trial, Inspector Draper testified about a rap video titled "On Da Boulevard," published on YouTube on October 23 and November 6, 2012.  In the video played for the jury, appellant and Anthony Green rapped while still photographs of them were displayed.  One of appellant's raps is: "I don't know who baked the last cake,/All I know was the place got yellow taped."  The People's position was that this was a reference to Baker's murder.

---

[21] Because of this conclusion, we need not decide the People's argument that the unchallenged admission of Jailhouse Gas and On Da Boulevard, as well as two Da Vill rap videos, rendered any error in the additional admission of the five challenged videos harmless.  We also need not decide their contention that the limiting instruction rendered any error harmless.

During cross-examination, to the apparent surprise of defense counsel, Draper testified that he, in consultation with the prosecutors, had edited the version of On Da Boulevard played for the jury in order to shorten it. The edit omitted a portion of the video in which Stoney Gipson raps while an image of Gipson is displayed with the text, "RIP Stone, The Realist." Defense counsel asked a number of questions on this issue, eliciting testimony that if the video had been created before Gipson's death—which occurred two days after Baker's murder—appellant's line about "who baked the last cake" would probably not have been a reference to Baker's killing. Draper testified he did not intentionally edit out Gipson's rap, but simply edited everything after appellant's "main portion of the rap lyrics" were over. The entire seven-minute video was played for the jury during this cross-examination.

Following Draper's testimony, the People recalled District Attorney's Office Inspector Jordan Boyd. Boyd testified that he obtained a thumb drive from Google (which owns YouTube) containing certain publicly-available videos, including the complete, unedited version of On Da Boulevard. This thumb drive had been admitted into evidence earlier in the trial, during the testimony of a Google employee. On cross-examination, Boyd testified that defense counsel had been provided with well over a terabyte of digital records, that four separate search warrants were served on Google for "many dozen videos," and that he was not certain whether the defense or the court was notified that the On Da Boulevard video was an excerpt of a longer video.

During closing arguments, both parties briefly argued about whether the On Da Boulevard video was made before or after Gipson's death. Defense counsel also questioned Draper's testimony that the editing was solely for time purposes: "[It] seems to me to be a powerful piece of evidence that the government would want to put on. They would want to tie Stoney Gipson and [appellant] together"; moreover, "I don't understand why where we've had such a gigantic amount of gang evidence that they would choose to edit that video." Defense counsel continued, "if the government is editing the videos and controlling the information as much as they can that goes to you, then is that the time where you want to sign off on these [verdict] forms? No. I would

26

submit to you that's the time where you want to dig in and do your job as jurors, which is sift through every single piece of evidence and determine what it means." In rebuttal, the prosecutor responded that the On Da Boulevard video "was moved into evidence in its entirety by us on July 21st. You can look at its exhibit tag. It was moved into evidence by us in its entirety. Inspector Boyd talked about it being moved into evidence and talked about it being in its entirety. [¶] Now, was an edited version provided on the screen? Yeah. But the complete version was in evidence. You know, there was no nefarious reason why." Defense counsel did not object during this portion of the prosecutor's rebuttal argument.

After closing arguments, outside of the presence of the jury, the trial court queried why a transcript of the full video had not been submitted as required by the California Rules of Court rule 2.1040; noted that, but for the cross-examination of Inspector Draper, the jury would not have known the entire video was in evidence; and stated the prosecutor's argument "suggests to the jury that the full seven-minute video was always a piece of evidence presented by the prosecution to the jury . . . ." The prosecutor conceded that the People did not intend to show the full video to the jury, but rather intended to use the exhibit of Google records as "the source material, the foundational material, to play the excerpt," and then later withdraw it. The prosecutor contended the rebuttal argument was not meant to suggest that the People intended to give the jury the full video, but merely to assert that "we didn't hide it" from the defense. After a lengthy discussion between the trial court and the prosecutor, the court concluded, "there is no finding of wrongdoing by the court. There is no admonition that I'm going to give. Just because I just think that what surprised me in [the prosecutor's] rebuttal argument is my interpretation, and it isn't fair for me to admonish the jury that counsel has said anything factually wrong or inappropriate."

At this point, defense counsel requested a curative instruction or the opportunity to surrebut on the issue. The court denied the request: "I think it is of such minimal weight in the totality of all of the evidence in this case . . . [and] it has been thoroughly vetted by counsel in front of the jury during direct and cross-examination." The court continued,

27

"I'm not going to admonish because I don't think there is any wrongdoing. I don't know if it was a misstatement. It doesn't jive with what the Rule of Court required if the prosecution had intended that the full seven-minute video be admitted to the jury. He says they did not, and I think that closes the book on this chapter."

2. *Analysis*

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. . . . [W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

Appellant contends the entire video "was not in evidence in any meaningful sense" because the People did not play it for the jury, provide a full transcription, or mention that the played video was only an excerpt. Nonetheless, as the People argue, the prosecutor's statement that the entire video was in evidence was literally true. The jury was fully aware of the omissions appellant notes. To the extent appellant argues that the prosecutor's argument could be construed to mean the People intended to present the full video to the jury, we disagree. In light of the cross-examinations of Draper and Boyd, we find no reasonable likelihood that the jury understood the argument to mean the prosecution independently intended to inform the jury about the unedited video, instead of as an argument about whether the prosecution attempted to conceal the unedited video from the defense.

Accordingly, appellant's misconduct claim fails. Because of this conclusion, we need not decide whether defense counsel forfeited the objection by failing to raise it during the prosecutor's rebuttal argument; we need not decide appellant's alternative argument that, if the objection were forfeited, appellant received ineffective assistance of

28

counsel; and the trial court's refusal to issue a curative instruction or allow the defense to surrebut was not an abuse of discretion.

B. *Burden of Proof Comment*

Appellant challenges the following argument in the prosecutor's closing statement: "They [the defense] don't have a burden of proof, but when they ask you to find a reasonable doubt, there has to be a reason behind it. And in the absence of producing any evidence that supports a reasonable doubt regarding the veracity of the evidence, the strength of the evidence, I would submit to you it is unreasonable." Appellant contends the argument was prosecutorial misconduct because it is reasonably likely the jury understood this argument to mean the defense had a duty to present evidence.

"To preserve a claim of prosecutorial misconduct on appeal, 'the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*People v. Clark* (2016) 63 Cal.4th 522, 577.) No objection was made below and appellant fails to demonstrate any misconduct would not have been cured by an admonition. Accordingly, the argument is forfeited.

Appellant alternatively contends his trial counsel was constitutionally ineffective for failing to object. Assuming the failure to object was deficient, we find no reasonable probability that the outcome would have been different. The prosecutor repeatedly noted appellant had no burden of proof, including at the beginning of the challenged comments. The trial court instructed the jury on the People's burden to prove their case beyond a reasonable doubt. (See CALCRIM No. 220.) Appellant's ineffective assistance of counsel claim is unavailing.

III. *Lesser Included Offense*

Appellant contends the trial court erred in refusing his request to instruct the jury on the lesser included offense of voluntary manslaughter because there was sufficient evidence that appellant killed in the heat of passion or imperfect self-defense; to wit, the jury could have found that Baker fired one shot based on the gun found underneath his

body and the gunshot residue on his hands. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1085 [trial court must instruct on lesser included offenses "when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged"].)

We need not decide whether the refusal to instruct was error because any error was harmless under any standard. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*Koontz, supra,* 27 Cal.4th. at pp. 1085–1086; see also *People v. Demetrulias* (2006) 39 Cal.4th 1, 24–25 [in such a case error is harmless beyond a reasonable doubt].) The jury found true the special-circumstance allegation that appellant committed the killing by means of lying in wait. In so finding, the jury found that appellant "made a surprise attack on the person killed from a position of advantage" and "intended to kill the person by taking the person by surprise." (See CALCRIM No. 728.) The jury also found true the gang special circumstance allegation, thereby finding that appellant "intentionally killed" Baker "to further the activities of the criminal street gang." (See CALCRIM No. 736.) Accordingly, the jury necessarily found appellant did not kill Baker " 'upon a sudden quarrel or heat of passion' " or "in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury." (*Koontz,* at p. 1086; see also *People v. Cruz* (2008) 44 Cal.4th 636, 665 ["special circumstance findings [that the murder was committed by means of lying-in-wait and intentionally for the purpose of perfecting an escape from lawful custody] themselves negate any possibility that defendant was prejudiced from the failure to instruct on provocation/heat of passion or unreasonable self-defense theories of manslaughter"].)[22]

IV. *LWOP Sentence*

---

[22] We reject appellant's contention that the cumulative prejudice from the asserted trial errors deprived him of a fair trial.

Appellant turned 18 one week before Baker was killed. He argues that, despite being 18 years old at the time of the murder, he was emotionally immature such that his mandatory sentence of life without the possibility of parole (§ 190.2, subd. (a)(15) & (22)) violates the constitutional prohibition on cruel and unusual punishment and the equal protection clause.

In *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " (*Id.* at p. 465; see also *id.* at p. 479 ["By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment."].) Our Supreme Court subsequently considered the bright line nature of the rule: " 'Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach.' [Citation.] But '[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood' [citation], and that is the line the high court has drawn in its Eighth Amendment jurisprudence." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1380.)

Appellant's case demonstrates the difficulty of categorical rules. Moreover, as he notes, the Legislature has required youth offender parole hearings after a certain number of years of incarceration for persons who committed their offenses at age 25 or younger, suggesting a legislative judgment that young adults share some of the same characteristics as juveniles. (§ 3051; but see *id.*, subd. (h) [statute does not apply to persons sentenced to life in prison without parole who were 18 years or older at the time of their offense].) Regardless, we are bound by the line drawn by the United States Supreme Court and our Supreme Court. (See *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [declining to extend *Miller* to defendant who committed murder five months after eighteenth birthday]; accord, *People v. Perez* (2016) 3 Cal.App.5th 612, 617 ["We

decline Perez's invitation to conclude new insights and societal understandings about the juvenile brain require us to conclude the bright line of 18 years old in the criminal sentencing context is unconstitutional. Our nation's, and our state's, highest courts have concluded 18 years old is the bright line rule and we are bound by their holdings."].)[23]

Appellant also argues that treating him differently from juvenile offenders violates equal protection. We reject the claim. Juveniles and young adults are not similarly situated, despite the possibility that some juvenile characteristics may persist in young adults. (See *Miller, supra,* 567 U.S. at p. 481 ["We have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children."]; *People v. Gamache* (2010) 48 Cal.4th 347, 405 ["We previously have rejected the argument that a death penalty scheme that treats differently those who are 18 years of age and older, and those younger than 18, violates equal protection."].)

V.  *S.B. 620 Remand*

The trial court imposed two additional terms of 25 years to life for firearm enhancements (§ 12022.53, subds. (d) & (e)). Appellant argues he is entitled to a remand of the firearm enhancements pursuant to new legislation that grants trial courts the discretion to strike or dismiss such enhancements. (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018; *People v. Chavez* (2018) 22 Cal.App.5th 663, 712 (*Chavez*) [§ 12022.53, subd. (h) applies retroactively in cases that are not yet final on appeal on its effective date].)

In light of this new legislation, " 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*Chavez, supra,* 21 Cal.App.5th at p. 713.) The People argue the record does so indicate.

---

[23] Appellant argues both *Miller* and *Gutierrez* involved defendants who were under 18 years old, and therefore neither court considered the application of mandatory life without parole sentences on 18-year-olds. Even if the defendants in those cases were not 18 years old, the cases make clear that 18 years is the dividing line for Eighth Amendment purposes.

At sentencing, the trial court stated that appellant "deserve[s] every day, every minute, every second that you will spend in state prison for the rest of your life without parole"; "has no empathy"; "took joy in celebrating the degradation of human life because you don't care about other people"; and is "a soulless, heartless human being" who does "not deserve sympathy." Appellant concedes the trial court would not strike the firearm enhancements on remand.

However, appellant argues the court's comments at sentencing indicated it was not fair and impartial and appellant thus seeks remand to a different bench officer. "[T]he statutory power of appellate courts to disqualify sentencing judges should be used sparingly and only where the interests of justice require it." (*People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562.) We are not persuaded that this is one of these rare cases. The trial court's comments at sentencing, while strong, do not demonstrate an "animus inconsistent with judicial objectivity." (*Ibid.*)

DISPOSITION

The judgment is affirmed.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.

(A152529)

34

Superior Court of San Mateo County, No. SC080432A, Hon. Lisa Novak, Judge.

Randi Covin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano and J. Michael Chamberlain, Deputy Attorneys General, for Plaintiff and Respondent.